IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00938-MEH

MSC SAFETY SOLUTIONS, LLC,

      Plaintiff/Counter Defendant,

v.

TRIVENT SAFETY CONSULTING, LLC,
DAX BIEDERMAN,
BRYAN McCLURE, and
SCOTT SEPPERS,

      Defendants/Counter Claimants,

v.

TROY CLARK,

      Counter Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Counter Defendants' Rule 12(c) Motion for Judgment on the Pleadings with Respect to Defendants' [Second] Amended Counterclaims [filed February 25, 2020; ECF 55]. The motion is fully briefed, and the Court finds that oral argument will not assist in its adjudication. Counter Defendants ask the Court to determine whether Defendants' counterclaims state plausible claims for relief.  For the following reasons, the Court will grant in part and deny in part Counter Defendants' motion.

**BACKGROUND**

I.   **Procedural History**

This action arises out of the departure of the individual Defendants from employment with Plaintiff to form the entity Defendant.  Plaintiff's allegations against Defendants involve computer fraud, misappropriation of trade secrets, and other state law violations. *See* Am. Compl., ECF 16. In response, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF 18.  The Court granted in part and denied in part the Defendants' motion and dismissed the Plaintiff's First Claim against Defendants Seppers and Trivent; Plaintiff's First Claim against Defendants Biederman and McClure pursuant to 18 U.S.C. §§ 1030(a)(5)(A) and 1030(a)(5)(C); Plaintiff's Second Claim as to Defendants Seppers and Trivent; and, Plaintiff's Sixth, Seventh, Eighth, and Ninth Claims against Defendants McClure, Seppers, and Trivent.  ECF 41.

In response to the remaining claims, Defendants filed an Answer and Counterclaims on November 5, 2019, asserting claims not only against Plaintiff but also against two individual Counter Defendants.  ECF 42.  Counter Defendants responded to the Counterclaims by filing a Motion to Dismiss on December 24, 2019.  ECF 49.  Counter Claimants timely filed a response to the motion, then filed a Motion to Amend on January 16, 2020, seeking to dismiss their second counterclaim and to add facts recently discovered in support of their remaining counterclaims.  ECF 50, 51.  The Court granted Counter Claimants' motion and denied as moot Counter Defendants' Motion to Dismiss; Counter Claimants' Amended Answer and First Amended Counterclaims was filed on January 31, 2020.  ECF 52, 53.  Counter Defendants filed an Answer to the First Amended Counterclaims on February 14, 2020; the present motion followed on February 25, 2020.  ECF 54, 55.

2

Three days later, Counter Claimants filed a Motion to Amend the First Amended Counterclaims seeking to remove three sentences from paragraphs 121, 207, and 208; the Court granted the motion on March 2, 2020 ordering that, due to the lack of amendment of claims subject to the present motion, "Counter Defendants need not re-file the pending motion for judgment on the pleadings." ECF 56, 57. Counter Claimants filed an Answer to First Amended Complaint and Second Amended Counterclaims on March 4, 2020, and Counter Defendants filed (what appears to be identical to ECF 54) their "Answer to First Amended Counterclaims" on March 16, 2020. ECF 58, 60.

On March 20, 2020, Plaintiff/Counter Defendants filed an unopposed Motion to Amend the First Amended Complaint; the Court granted the motion and the operative Second Amended Complaint was filed on March 23, 2020. ECF 63, 64, 66. In response to the Second Amended Complaint, Counter Claimants filed the operative Answer to Second Amended Complaint and Second Amended Counterclaims on April 13, 2020. ECF 71.

On May 27, 2020, Counter Claimants filed a Motion to Voluntar[il]y Dismiss counterclaims against Joe Toth and their tortious interference with business relations counterclaim; following full briefing, the Court granted the motion on June 9, 2020. ECF 74, 79. Accordingly, in adjudicating the present motion, the Court will omit these claims from its analysis.

## II.   Counter Claimants' Statement of Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Counter Claimants in the Second Amended Counterclaims, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Prior to his work for Plaintiff MSC Safety Solutions, LLC ("MSC"), Counter Claimant Dax Biederman ("Biederman") worked for J.R. Butler, Inc., a Colorado company. Counter Defendant Troy Clark ("Clark"), individually and by and through MSC, promised Biederman that if he would leave J.R. Butler, Biederman would have the opportunity to become an owner of MSC, since Clark wanted to hire people who would take over his company. In 2015, Biederman began talking to a senior consultant to join Miller Safety (later renamed MSC Safety Solutions). Clark informed Biederman of his intention to purchase Miller Safety and his intention to hire Biederman, if he received his professional accreditation of CHST. Biederman took all required classes and received his CHST, based on Clark's promises. During the same conversations, Clark informed Biederman that he intended to sell parts of the company to "key" people who would have interest in ownership of the company so that Clark could retire and maintain an income, and Biederman was a "key" person. Clark made it clear to Biederman that he would not pay Biederman as much as he was paid at J.R. Butler, but the work he would put in would be a long-term investment for both of them. When Biederman arrived at MSC, he brought his teaching materials, years of knowledge, and contacts in the field.

Prior to his work for MSC, Counter Claimant Bryan McClure ("McClure") worked for LPR Construction, a Colorado company. On or about February 1, 2016, Clark reached out to McClure to see if he would be interested in leaving LPR for MSC. Clark, individually and by and through MSC, promised McClure that if he would leave LPR Construction, McClure would have the opportunity to become an owner of MSC. During telephone calls between February 1, 2016 and March 18, 2016, Clark offered ownership interest to McClure in exchange for "sweat equity," which included taking a substantial pay cut in current compensation. At the time of his hire, McClure

4

made it clear that he accepted Clark's offer specifically because Clark offered him stock or ownership.  McClure took a $53,000.00 per year pay decrease based on Clark's promise of stock ownership, which Clark knew at the time of the offer.  When McClure arrived at MSC, he brought his teaching materials, years of knowledge, and contacts in the field.  McClure's teaching materials, which are still used by MSC to teach classes, included qualified rigger/signal person; forklift operator; aerial/scissor lift; confined space construction,  Subpart R (Steel Erection); forklift train the trainer & aerial scissor lift train the trainer; ironworker level l; ironworker level 2; and ironworker level 3.   McClure had hundreds of contacts in the safety space when he came to MSC.

Neither Clark nor MSC ever had Biederman, McClure, or Seppers sign anything verifying that they were not bringing third party trade secrets to MSC, nor paid Biederman, McClure, or Seppers to assign any of their prior materials, contacts, or other potential trade secrets to MSC. None of the Counter Claimants signed an employment contract with MSC, though Biederman was provided an offer letter dated March 7, 2016.  Despite contrary terms in the letter, MSC gave Biederman ten days of vacation time in 2016 and 2017.

Shortly after he was hired at MSC, McClure was tasked with management of the online systems, advertisements, and social media pages, which McClure understood to be "sweat equity" responsibilities rather than paid duties.  He expended significant time and effort into these tasks. Clark had no idea how to use social media pages, logins, or other technological systems.  MSC has no server and Clark did not understand that.  No one else at MSC understood how to run the website or other technological systems at MSC.  McClure created Google metrics, ad words, blogs, and additional social media advertising for MSC. McClure had all administrative access for MSC's website and was given no additional compensation for these tasks.  McClure's likeness is still being

used by MSC; specifically, McClure's video of himself walking on a crane is used on MSC's SEASAC website.

During their time at MSC, Biederman, McClure, and Seppers were not given authority to make decisions regarding client contacts and other day-to-day business operations. All proposals needed to go to Clark and could not be executed by the employees. Biederman, McClure, and Seppers created documents and watched co-workers create documents. Most documents, training materials, and other teaching materials were created by using OSHA and other third-party materials such as those at www.safetyresourcing.com, www.equipmenttrainingsolutions.com, AGC of Colorado, AGC of America, and Google. MSC created almost none of its own materials; thus, MSC's documents, training materials, and other teaching materials were not original.

Biederman and McClure created the "Rigger/Signalperson" program and "24-hour Fall Protection Program" while at other companies. MSC did not compensate Biederman or McClure for these creations or for bringing the Rigger/Signalperson program and 24-hour Fall Protection Program to MSC.

MSC provided its documents, training materials, and teaching materials to students, contractors, and vendors without having them sign any contracts, non-disclosure agreements, or confidentiality agreements. Clark told McClure and Seppers that MSC did not have anything proprietary. However, at one point, MSC fired an employee who took MSC's entire s: drive.

MSC uses independent contractors regularly, but does not limit which documents it provides to independent contractors. MSC publishes its clients list on its website at https://www.mscss.info/. Many of MSC's clients are acquired through trade associations or other commonplace organizations. MSC publishes its pricing on its website for each individual class. All of MSC's business and

industry information is publicly known, easily ascertainable, or common in the industry. MSC never had any policies regarding email protection, retention, or deletion or, if it did, it never communicated them to its employees.  MSC required its employees to use their personal iTunes accounts and iCloud backups on company iPads, for backing up photographs, videos, and other documents.

In December 2017 at an end-of-the-year meeting, Clark announced that he would determine options to allow Biederman and McClure to move toward ownership by the end of 2018.  Clark met with Biederman, McClure, and Craig Hautamaki and indicated that he needed to speak with his accountants about the transfer of ownership, but anticipated giving the three employees ownership shares in MSC as soon as he accomplished that task.  At that meeting, McClure informed Clark that if he was not an owner by the end of the year, McClure was going elsewhere.

In March 2018, McClure informed Clark that he would leave to start his own company if the stock ownership was not forthcoming.  At that time, Clark again reassured McClure that he would have ownership interest by the end of 2018.  However, in August 2018, Clark told Biederman and McClure that he was never giving either of them any ownership interest.  Clark clarified that he would never provide them any ownership interest in the future.  Clark added that he never intended to provide them any ownership interest in MSC.  At that point, McClure and Biederman began discussing separating from MSC.  Seppers, a good friend of McClure's, often was involved in the conversations.

In September 2018, Biederman, McClure, and Seppers (hereafter, "Counter Claimants") began making preparations to leave MSC and form Trivent Safety Consulting, LLC ("Trivent").  During this time, Counter Claimants continued to work at MSC.  No complaints were made concerning Counter Claimants' work, lack thereof, or performance during this time.

In October 2018, Counter Claimants decided to give notice to MSC of their resignations at Thanksgiving and to open Trivent for business in the New Year.  At this point, Trivent had been opened legally, but Trivent was not advertising, connecting with any clients, or otherwise taking any actions aside from preparing for an opening date.  In late October 2018, McClure received a call from Clark on a Saturday during a child's birthday party.  Clark asked McClure to leave for an out-of-state appointment the next day, but McClure refused; at that moment, McClure knew Clark and MSC were likely to terminate his employment for refusing to make the trip.  That week, Counter Claimants decided to provide their two-weeks' notice to MSC on November 1, 2018, with the intention of opening Trivent for business on November 19, 2018.  Counter Claimants knew, however, that Clark might fire them immediately upon giving notice.  Given that knowledge, Counter Claimants spent the week leading up to November 1, 2018 preparing to leave MSC.  None of the Counter Claimants wanted Clark to have access to the personal emails on their work accounts, as he had a history of making inappropriate and obscene comments about employees' wives and underage daughters.

On November 1, 2018, Counter Claimants submitted to MSC their two-week notices; as expected, Clark fired Counter Claimants immediately.  MSC assured Counter Claimants that their paychecks would come on the usual day, Friday, November 9, 2018.  Due to the quick exit from MSC, Counter Claimants realized later that they had some items that had not been turned in that day.  As Counter Claimants found additional items over the next several weeks, they returned them to MSC promptly.  These items included credit cards, additional keys, and a bag with teaching materials and ITI cards in them.

On November 5, 2018, Counter Claimants officially opened Trivent for business.  All of

Trivent's clients contacted Trivent to request pricing or contracts.  When Trivent employees prospect for clients, they use publicly available resources such as the AGC of Colorado, the ABC of Colorado, and the HBA of Colorado.  Trivent's first job was performed on November 20, 2019 for a client who has not worked with MSC.  Counter Claimants have continued their roles on boards of directors and members of industry organizations such as the AGC of Colorado.

Counter Claimants' paychecks from MSC did not arrive on November 9, 2018 as promised. In the interim, Clark and MSC provided a statement to the Firestone Police Department[1] containing a series of falsehoods, including that Counter Claimants had stolen from MSC, but they failed to identify any items that Counter Claimants had stolen and failed to provide other information requested by the Firestone Police.  Clark and MSC knew that Counter Claimants had not stolen anything, that Counter Claimants had returned all MSC items to MSC, and that they had no proof of any theft, but they called the Firestone Police Department with the intent, at least partially, to delay paying Counter Claimants their final paychecks.  The Firestone Police Department informed Clark and MSC that without proof of theft, the police could not accuse people of a crime and would not file charges regarding MSC's or Clark's claims.

On November 13, 2018, Counter Claimants made a formal demand for final paychecks withheld by MSC.  MSC failed to respond; thus, on December 5, 2018, Counter Claimants filed complaints with the Colorado Division of Labor.  MSC has since paid McClure's and Seppers' final paychecks via the Colorado Division of Labor.  On December 3, 2019, the Colorado Department

---

[1]The allegations reference both the "Firestone Police Department" and "Frederick Police Department."  However, because the original allegations refer to "Frederick" and the amended allegations refer to "Firestone," the Court will reasonably assume the Counter Claimants intend the reference properly be to "Firestone."

of Labor issued three separate Notices of Determination and Enclosed Citation of Assessment for Counter Claimants that included additional damages.  On or about January 7, 2020, Clark and MSC filed an appeal.

On November 16, 2018, Counter Claimants provided all documents, information, and material from MSC to their attorneys to be held at the attorneys' office until the conclusion of this case.  Since that time, Counter Claimants have had no access to the materials, except to briefly respond to MSC's request that Seppers complete an OSHA-10 class registration for which Seppers no longer had the information.

Since leaving MSC on November 1, 2018, Counter Claimants have been told multiple times by various parties, including friends, acquaintances, and MSC clients for whom Counter Claimants worked prior to November 1, that MSC, Clark, and other employees of MSC have called their businesses and accused Counter Claimants of theft.  Specifically, Clark has informed these third parties that Counter Claimants left MSC to start a new company and had stolen items from MSC; Clark purportedly told the parties that, in an effort to perform due diligence, he was checking to see whether the parties had any of the stolen items, although he knew they did not.  Several parties have also informed Counter Claimants that MSC, Clark, and other employees of MSC told them that Counter Claimants were incapable of doing their jobs.

On or about November 14, 2018, Mike Waters told McClure that Clark told the entire Steel Erectors Safety Association of Colorado ("SESAC") board that Counter Claimants quit their employment at MSC without notice.  Waters stated that Clark also told the SESAC board the Counter Claimants left him with three classes to teach due to giving no notice.  SESAC includes at least thirty companies in Colorado that are prospective or current clients of the Counter Claimants,

including RMS Cranes, Derr & Grunewald Construction Company, and RK Steel.

In early December 2018, an MSC employee told potential clients of Trivent that Counter Claimants lacked OSHA-required certifications despite representing they were certified.  Also, in the first quarter of 2019, Kathy Freeman, Safety Director at HEI Civil, told McClure that Clark spoke unprofessionally and inappropriately about Counter Claimants during the AGC National Conference. Sometime in 2019, the safety director of SEMA informed Biederman that Clark contacted the organization in an attempt to gain SEMA's business after SEMA had entered into a contract with Trivent.

## LEGAL STANDARDS

A dismissal under Fed. R. Civ. P. 12(c) is reviewed under the standard applicable to a Rule 12(b)(6) motion.  *Williams v. Genesis Fin. Techs. Inc.*, 790 F. App'x 161, 164 (10th Cir. 2019) (citing *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009)).

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679.  Second, the Court must consider the factual allegations "to determine if they

plausibly suggest an entitlement to relief." *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context."  *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)).  Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim.  *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief."  *Id*. (quotation marks and citation omitted).

## ANALYSIS

Again, the counterclaims against Defendant Toth and the first counterclaim against all Counter Defendants have been dismissed.  ECF 69.  Thus, the issues before the Court are whether (1) the second counterclaim for defamation identifies defamatory statements and plausibly states a claim for relief; (2) the third counterclaim for unjust enrichment against MSC states a plausible claim; (3)  the intentional (fifth) and negligent (sixth) misrepresentation counterclaims state plausible claims; and (4) the fourth counterclaim for civil conspiracy states a plausible claim.

## I.    Second Counterclaim for Defamation

"Defamation is a communication that holds an individual up to contempt or ridicule thereby causing him to incur injury or damage." *Lawson v. Stow*, 327 P.3d 340, 345 (Colo. App. 2014) (quoting *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994)).  A cause of action for defamation requires, at a minimum, publication of a false statement of defamatory fact.  *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1341 (Colo. 1988).  Defamation actions may lie for written or spoken statements, in the forms of defamation by libel or defamation by slander, respectively.  *See Denver Pub. Co. v. Bueno*, 54 P.3d 893, 898 (Colo. 2002).  Here, the challenged statements appear to be both written (report to police) and spoken (statements to SESAC board and to existing and potential customers).

The elements of a defamation cause of action are: "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication."  *Lawson*, 327 P.3d at 345 (quoting *Williams v. Dist. Court*, 866 P.2d 908, 911 n.4 (Colo. 1993) and citing *McIntyre v. Jones*,

194 P.3d 519, 523–24 (Colo. App. 2008)).

Whether a statement is defamatory is a question of law. *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (citing *Walker v. Associated Press*, 160 Colo. 361, 417 P.2d 486 (1966)). "Defamation . . . may be defamatory per se when the statements are recognized as inherently injurious to reputation. Alternatively, statements are defamatory per quod when extrinsic facts are necessary to illustrate their libelous [or slanderous] nature by way of innuendo." *Denver Pub. Co.*, 54 P.3d at 898 (citation omitted). Courts have found that statements of "dishonesty" and statements falling into the following categories—"(a) a criminal offense . . . (b) a loathsome disease . . . (c) [a] matter incompatible with [plaintiff's] business, trade, profession, or office . . . [and] (d) serious sexual misconduct"—are defamatory as a matter of law. *See id.* at 899, n.9; *see also Churchey*, 759 P.2d at 1341 ("[t]he statement that Churchey was 'dishonest' is clearly defamatory").

Counter Defendants first contend that, with one exception (police report), Counter Claimants fail to identify any false factual statement or the recipients of such statements. The Court disagrees. Counter Claimants allege that on or about November 14, 2018, an individual named Mike Waters informed McClure that Clark told the entire SESAC board, which includes at least thirty companies in Colorado that are prospective or current clients of the Counter Claimants, that Counter Claimants quit their employment at MSC without notice and left Clark with three classes to teach due to giving no notice. Counter Claimants also allege that Clark contacted certain parties, including MSC clients with whom Counter Claimants had worked, that Counter Claimants left MSC to start a new company and had stolen items from MSC and/or were incapable of performing their jobs. Moreover, in early December 2018, an MSC employee told potential clients of Trivent that Counter Claimants lacked OSHA-required certifications despite representing they were certified. Taking these allegations as

14

true, and considering the undisputed fact that MSC and Trivent are competitors, the Court finds Clark's statements fall into the categories of a criminal offense and matters incompatible with Counter Claimants' business and, thus, are defamatory as a matter of law.

Counter Defendants assert that the alleged statements are merely "opinions" that are not actionable, but the Court finds otherwise. Whether a statement is an opinion "involves two inquiries." *Keohane*, 882 P.2d at 1299.

> The first inquiry is whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Milkovich* [*v. Lorain Journal Co.*], 497 U.S. [1, 21 (1990)]. The second inquiry is whether reasonable people would conclude that the assertion is one of fact. *Id.* The factors relevant to the second inquiry are: (1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed. *Burns* [*v. McGraw–Hill Broadcasting Co.*], 659 P.2d [1351, 1360 (Colo. 1983)].

*Id.* Here, the Court finds that whether Counter Claimants quit their employment without notice and left Clark to teach three classes; whether Counter Claimants "stole" items from MSC; whether Counter Claimants are not capable to perform their work; and whether Counter Claimants lack OSHA-required certifications are facts, as opposed to opinions, which a reasonable person would conclude are facts susceptible of being proved true or false.

Counter Defendants also argue that their statement to the police is "privileged" and cannot form the basis of a defamation claim.[2] "[T]o account for the existence and importance of society's interest in free speech, the courts have imposed a number of modifications to the common law of

---

[2] Counter Defendants rely in part on a decision attached to their motion, *Gilman v. Loomis Armored US, LLC*, No. 10CV1767. While the decision is identified by the electronic legal research service as originating from the United States District Court for the District of Colorado, the case number does not match and the Honorable Morris B. Hoffman is a judge for the Second Judicial District Court in Denver, Colorado. *See* ECF 55-1.

defamation . . . ." *Lawson*, 327 P.3d at 345 (quoting *McIntyre*, 194 P.3d at 524).  One such modification is the qualified privilege applicable to statements relating to matters of public concern. *Id.*; *see also Burke v. Greene*, 963 P.2d 1119, 1122 (Colo. App. 1998) ("Colorado law recognizes a qualified privilege for communications by a party with a legitimate interest to persons having a corresponding interest and communications promoting legitimate individual, group, or public interests.").  For statements concerning matters of public concern, "[t]here is no absolute immunity from liability, but the defamed party is subject to heightened burdens of proof . . . : (1) the defamed party must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance; (2) the defamed party must prove that the speaker published the statement with actual malice—that is, with actual knowledge that the statement was false or with reckless disregard for whether the statement was true; and (3) the defamed party must establish actual damages to maintain the action, even if the statement is defamatory per se." *Lawson*, 327 P.3d at 346.

"[C]ourts in numerous jurisdictions, including Colorado, have held that a private individual's report to law enforcement authorities of possible criminal conduct is subject to the qualified privilege." *Id.* (citing *Burke*, 963 P.2d at 1122) ("[T]he general rule in the law of defamation is that statements made to law enforcement officers are entitled to only a qualified privilege and not one that is absolute.")).  Thus, a plaintiff may recover for defamatory statements made to a police officer if he can prove falsity of the statements by clear and convincing evidence; the defendant made the alleged statements with malice, i.e., with knowledge that they were false or with reckless disregard for whether they were true or false; and actual damages.  *See id.*

In this case, Counter Claimants allege that, on November 16, 2018, Clark and MSC provided a statement to the Firestone Police Department, in which they stated that Counter Claimants "had

stolen from MSC," but Clark and MSC "failed to identify any items" that were stolen and they "knew" the Counter Claimants "had returned all MSC items to MSC." Counterclaims, ¶¶ 107-111. Counter Claimants also allege that "Clark and MSC provided this information to the [Firestone] Police Department at least partially to delay paying the [Counter Claimants'] final owed payments." *Id.* ¶ 115. Taking these allegations as true, the Court finds them sufficient to overcome the qualified privilege and state a plausible claim for defamation based on the police report.

In sum, the Court finds the allegations supporting Counter Claimants's defamation claim regarding Clark's statement(s) to the SESAC board, Clark's statement(s) to MSC customers that Counter Claimants had stolen items from MSC and/or were incapable of performing their jobs, the MSC employee's statement(s) to Trivent's potential clients that Counter Claimants lacked OSHA-required certifications despite representing they were certified, and the police report are sufficient to state plausible counterclaims against MSC and Clark.

## III.   Third Counterclaim for Unjust Enrichment against MSC

To state a plausible claim for unjust enrichment, the Counter Claimants must allege that: "(1) at [Counter Claimants'] expense; (2) [Counter Defendants] received a benefit; (3) under circumstances that would make it unjust for [Counter Defendants] to retain the benefit without paying . . . . Whether injustice results often will turn on whether a party engaged in some type of wrongdoing." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000). Counter Claimants allege Counter Defendants have been unjustly enriched by benefitting from[3] McClure's

---

[3]In the First Amended Counterclaims ("FAC"), Counter Claimants alleged, "MSC has benefited [sic] from the services of Biederman," "MSC has failed to pay Biederman for his services as a salaried employee," and "Paying Biederman his remaining salary . . . will restore [him] to the position formerly occupied." FAC, ¶¶ 206-208, ECF 53. However, in seeking leave to file the operative Second Amended Counterclaims ("SAC"), the Counter Claimants expressed their desire

services in applying Google AdWords, building websites, and posting on MSC's blog and from the Counter Claimants' "contacts, educational materials, videos, and posts" without paying them.

Counter Defendants argue that the claim "fails as a matter of law because [Counter Claimants] did, in fact, receive compensation for their work pursuant to the express terms of their employment with MSC." With respect to Counter Claimants' first basis—McClure's technological services—the Court finds Counter Defendants' argument unpersuasive; for a Rule 12(c) analysis, the Court must take the allegations as true and, here, Counter Claimants allege McClure provided services to Counter Defendants for which he was not paid. As for the "unjust" requirement, the Counter Claimants allege that McClure was promised "equity" in MSC in exchange for the challenged services, which was later withdrawn, and that Counter Defendants continue to benefit from the technology created by McClure. The Court finds these allegations sufficient to state a plausible claim for unjust enrichment.

The allegations are insufficient, however, to state a plausible claim that Counter Defendants have unjustly benefitted from the Counter Claimants' contacts and materials. Counter Claimants assert that they created the materials and, under intellectual property principles, they are entitled to be paid for their use. Resp. at 18. Even if this is true, the Court finds Counter Claimants fail to allege any facts demonstrating Counter Defendants' retention of the benefit was unjust or that Counter Defendants engaged in any wrongdoing in combination with, or in addition to, failing to

---

to remove ¶¶ 207 and 208 from the SAC; accordingly, the Court finds that Counter Claimants have abandoned the portion of their Unjust Enrichment claim involving the "services of Biederman." Moreover, the Counter Claimants assert in response to the present motion that they have "alleged *two* bases for the unjust enrichment claims" and cite those listed here. Resp. at 17 (emphasis added). Therefore, the Court finds the Counter Claimants also have abandoned the portion of the claim relating to "McClure's likeness" on MSC's website. *See* FAC ¶¶ 209-211; SAC ¶¶ 206-208.

pay for the materials. Certainly, taking the allegations as true, the Counter Claimants and Counter Defendants engaged in arms-length transactions in securing Counter Claimants' employment with MSC and, if Counter Claimants believed (additional) compensation was necessary for MSC's use of their contacts and/or materials, there is nothing alleged demonstrating they were prohibited from negotiating for such compensation. Moreover, the SAC contains no allegations regarding whether Counter Claimants' materials and contacts constituted "intellectual property" that were "infringed" by MSC and Clark. The Court will grant Counter Defendants' motion for judgment as to this portion of the Unjust Enrichment claim.

Accordingly, the Court will permit the portion of the Unjust Enrichment claim involving McClure's technological services to proceed, but will dismiss the portion regarding Counter Claimants' "contacts, educational materials, videos, and posts."

## III.    Fifth and Sixth Counterclaims for Intentional and Negligent Misrepresentation

Under Colorado law, a plaintiff must make five showings to establish a claim of intentional misrepresentation: (1) the defendant made a false representation of material fact; (2) the one making the representation knew that it was false; (3) the person to whom the representation was made was ignorant of the falsity; (4) the representation was made with the intention that it be acted upon; and (5) the reliance resulted in damage to the plaintiff. *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013) (citing *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012)). The fifth element regarding reliance "requir[es] the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages." *Id.* A fact is material "if a reasonable person under the circumstances would attach importance to it in determining his or her course of action." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs*

*LLP*, 420 P.3d 223, 234 (Colo. 2018) (citing *Denberg v. Loretto Heights Coll.*, 694 P.2d 375, 377 (Colo. App. 1984)).   In addition, "[a] party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation." *Id.* (citing *Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.*, 57 P.3d 738, 749 (Colo. App. 2002)). Further, "[u]nder Federal Rule of Civil Procedure 9(b), 'fraud or mistake' must be pled with particularity, meaning that a plaintiff must, at the minimum, 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Pernick v. Computershare Trust Co., Inc.*, 136 F. Supp. 3d 1247, 1269 (D. Colo. 2015).

The elements for negligent misrepresentation are: (1) one in the course of his or her business, profession or employment; (2) makes a misrepresentation of a material fact, without reasonable care; (3) for the guidance of others; (4) with knowledge that his or her representations will be relied upon by the injured party; and (5) the injured party justifiably relied on the misrepresentation to his or her detriment. *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011).   "Whether [a party] justifiably relied on [an] alleged misrepresentation [is] a question of fact" typically to be determined by the factfinder unless reasonable minds could not differ.   *Hardy v. Flood*, No. 17-cv-00677-CMA, 2019 WL 937708, at *5 (D. Colo. Feb. 26, 2019) (quoting *Loveland Essential Grp., LLC v. Grommon Farms, Inc.*, 251 P.3d 1109, 1116–17 (Colo. App. 2010)).

Counter Defendants contend that the allegations supporting the intentional misrepresentation claim are not pled with the required specificity; the Court disagrees.[4]  Counter Claimants allege that

---

[4]Notably, the Court finds the allegations supporting the fifth and sixth counterclaims are clear that the claims are alleged by McClure and Biederman.  However, to the extent that the allegations may be construed as alleged by Seppers, the Court finds them insufficient to state plausible claims

Clark represented to Biederman and McClure that he would provide them ownership interests in MSC; Clark made the representation with the intent that Biederman and McClure quit employment with other companies and accept employment at MSC; Biederman and McClure relied on the representation when they quit employment with other companies and accepted employment at MSC; when they accepted employment at MSC, Biederman and McClure took "pay reductions" and Biederman completed his "CHST"; Clark repeated the representation to Biederman and Clark in 2017 and 2018, and they had no reason to disbelieve Clark; Clark eventually "admitted" in late 2018 that "he had never intended to give up any ownership interest in MSC." The Court finds these allegations sufficiently specific in accordance with Rule 9(b). Moreover, although the representation is a future promise, the allegations, taken as true, demonstrate Clark falsely stated (at the time he made the statements) that he would give up ownership interest in MSC to induce Biederman and McClure to accept and continue employment with MSC. *See Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo. App. 2005) ("Unless the speaker making the representations deliberately falsified his or her intention to induce reliance, statements of future events are not actionable."); *see also Cobank, ACB v. Reorganized Farmers Co-op. Ass'n*, 170 F. App'x 559, 568 (10th Cir. 2006) ("in Colorado, fraud requires more than mere nonperformance of a promise or failure to do an agreed action at a future time; instead, it requires proof the person making the representation 'had the present intention not to fulfill the promise.'").

Counter Defendants argue that the "vague and conclusory" allegations supporting Counter Claimants' negligent misrepresentation claim—"Neither Clark nor MSC had considered whether they actually desired to provide ownership interest to Biederman and McClure" and "Clark and

for relief.

MSC should have known that they would not provide ownership interest to Biederman and McClure"—are "nonsensical" and inconsistent with the allegation that Clark admitted he never intended to give up ownership in MSC.  Counter Claimants respond that the claim requires a showing that the supplier of false information "makes a representation that they should know is not true" and, "[i]n the case of a future promise, that results in the person not making a real determination as to whether they will or would do such a thing."  Resp. at 21 (citing *Nelson*, 121 P.3d at 345).  While the Court agrees that the allegations are vague and may be construed as Counter Defendants construed them (i.e., "they should have known, at the time they made this . . . promise, that they would change their minds"), the allegations may also be construed as how Counter Claimants describe them: Clark should have known at the time he made the representations that they were false and, in so knowing, he did not consider an actual (or "real") desire to provide an ownership interest to Biederman and McClure. Construed in this way and taking them as true, the Court finds Counter Claimants' allegations sufficient to state a plausible claim for negligent misrepresentation.

Thus, the Court will deny Counter Defendants' motion for judgment as to the fifth and sixth counterclaims.

**IV.      Fourth Counterclaim for Conspiracy**

Under Colorado law, conspiracy "is a derivative cause of action that is not actionable per se." *Double Oak Const., L.L.C. v. Cornerstone Dev. Intern., L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003). To recover damages for civil conspiracy, there must be (1) two or more persons, (2) an object to be accomplished, (3) an agreement on the object or course of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result thereof.  *Jet Courier Serv. Inc. v. Mulei*, 771 P.2d 486,

502 (Colo. 1989). "If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself." *Double Oak*, 97 P.3d at 146; *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995) ("[C]onspiracy must involve an unlawful act or unlawful means ... [and] a party may not be held liable for doing in a proper manner that which it had a lawful right to do.").

Counter Defendants contend that the allegations fail to state a meeting of the minds between two or more persons, particularly as an employer and its employees do not constitute the two or more persons required for a conspiracy. Mot. at 20 (citing *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986) ("[a] corporation and its employees do not constitute the 'two or more persons' required for a civil conspiracy, at least if the employees are acting on behalf of the corporation and not as individuals for their individual advantage")). Counter Claimants respond that the Court may infer from the allegations supporting the conspiracy claim, including actions taken by Clark and former Counter Defendant Joe Toth, that "the employees [were] acting as individuals for their individual advantage." Resp. at 19. Counter Defendants argue that the combinations of MSC and Clark and MSC and Toth do not plausibly allege "two or more persons."

Counter Claimants seem to imply that a conspiracy between a corporation and its employee is sufficient if the employee is acting for his or her individual advantage. The Tenth Circuit's opinion in *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994), seems to support the contention. In determining that the same reasons supported the viability of both a federal statutory conspiracy claim and a Colorado common law conspiracy claim, *id.* at 1129-30 (citing *Pittman*, 724 P.2d at 1390), the court found the challenged allegations "suggest[ed] that the employees were acting for their own personal purposes and not blindly executing corporate policy. In doing so, they

became 'independent actors who can conspire with the corporation.'" *Id.* at 1127 (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir.1981)).

With that said, the Tenth Circuit also specified that the corporation acted through an individual manager, William Weston. *Id.* at 1126; *see also Pittman*, 724 P.2d at 1390 (allegation that two individuals conspired, one working on behalf of the corporation ("Fitzsimmons") and the other for his individual advantage ("Larson")). Here, there are no allegations that MSC acted through any individual. To the extent the allegations may be construed as reflecting that MSC acted through Clark, the allegation that "MSC and Clark agreed to accomplish the above purposes" (SAC ¶227) is insufficient because it does not reflect "two or more persons." Moreover, the allegation that "MSC and its employees, including Toth, agreed to accomplish the above purposes" (SAC ¶ 228) is insufficient because Toth would necessarily be the employee acting for his individual advantage, but he has been dismissed from this case. *See Pittman*, 724 at 1390.

Accordingly, the Court will grant Counter Defendants' motion and dismiss the fourth counterclaim for civil conspiracy.

## CONCLUSION

The Court finds that Counter Claimants state plausible counterclaims for defamation alleged by all Counter Claimants (second), unjust enrichment alleged by McClure (third), and intentional misrepresentation (fifth) and negligent misrepresentation (sixth) alleged by McClure and Biederman. However, the allegations, taken as true, do not state plausible counterclaims for civil conspiracy (fourth) and a portion of the unjust enrichment involving Counter Claimants' "contacts, educational materials, videos, and posts." Accordingly, Counter Defendants' Rule 12(c) Motion for Judgment on the Pleadings with Respect to Defendants' [Second] Amended Counterclaims [filed February 25,

2020; ECF 55] is **granted in part and denied in part**.

Entered and dated at Denver, Colorado, this 24th day of July, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge