IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00938-MEH

MSC SAFETY SOLUTIONS, LLC,

      Plaintiff/Counter Defendant,

v.

TRIVENT SAFETY CONSULTING, LLC,
DAX BIEDERMAN,
BRYAN McCLURE, and
SCOTT SEPPERS,

      Defendants/Counter Claimants,

v.

TROY CLARK,

      Counterclaim Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court are the parties' Motions for Summary Judgment. ECF 82, 83. The Motions are fully briefed, and the Court finds that oral argument will not materially assist in their adjudication. For the following reasons and based on the submitted record, the Motions are granted in part and denied in part.

## BACKGROUND

### I.      Real Party in Interest

Defendants worked for the corporate entity "MSC, Inc." A new corporation, MSC Safety Solutions, Inc., was formed in December 2018, about two months after Defendants had quit. ECF 83-3. That new corporate entity is Plaintiff. Its accountant explains that Plaintiff's formation was part of a restructuring of several "MSC" entities and trade names. ECF 95-1 at ¶¶ 3–5. The prior entity still exists. However, all but some physical assets were transferred to Plaintiff. *Id*. at ¶ 6.

Defendants complain that they did not learn of Plaintiff's formation until June 2020, shortly before the filing of the summary judgment motions. They dispute whether the evidence establishes the transfer of rights to Plaintiff, and they argue that it is not the real party in interest. Even if Defendants are correct, the Court finds that they show insufficient prejudice to warrant the lawsuit's dismissal on that basis. From the lawsuit's beginning, Plaintiff has referred to itself as "f/k/a MSC, Inc., d/b/a MSC Safety Solutions," which gave at least some notice of the restructuring. Plaintiff continues to hold itself out as the owner of its claims for relief as well as the entity that is liable for Defendants' counterclaims. Finally, Defendants concede that Plaintiff is allowed the opportunity for ratification pursuant to Fed. R. Civ. P. 17(a)(3). Therefore, the Court proceeds for purposes of this summary judgment ruling on the assumption that Plaintiff is the real party in interest. To simplify the below discussion, references to "Plaintiff" mean the corporate entity that existed at all relevant times.

## II.      Material Undisputed Facts

### A.      The Parties

Plaintiff

1.      Plaintiff provides loss control and risk management services to commercial construction contractors, government agencies, and general industry manufacturing facilities. It filed its Articles of Organization in December 2018. Defendants' Original Statement of Undisputed Facts ("OSUF") ¶¶ 1–2; ECF 95-1.

2.      Plaintiff is owned by Counterclaim Defendant Troy Clark ("Clark"). Response to the Statement of Undisputed Facts ("RSUF") ¶ 21.

3.      Plaintiff subscribes to the National Center for Construction Education and Research ("NCCER"), a not-for-profit that creates training and credentialing programs for the construction industry including the Ironworker Apprenticeship program. OSUF ¶¶ 136–40.

Defendant Bryan McClure

4.      Defendant Bryan McClure ("McClure") had twenty-four years of experience in the construction industry as of early 2016. Reply Statement of Undisputed Facts ("Reply SUF") ¶ 9.

5.      McClure has been teaching about the use of heavy cranes and rigging since he was eighteen years old. OSUF ¶ 305.

6.      As of early 2016, McClure was a Senior Training Manager at LPR Construction ("LPR"). OSUF ¶ 12. He developed training materials there. Reply SUF ¶ 12; OSUF ¶ 126.

7.      McClure left LPR with over 600 GB of documents and materials on a personal external hard drive. Reply SUF ¶ 16. At some point, LPR sent him a cease and desist order not to recruit its employees to work for Plaintiff and not to use its training materials. Reply SUF ¶ 58(b).

McClure testified at deposition that LPR was aware of what he had taken when he left. OSUF ¶ 127.

8.      In 2016, Clark offered McClure employment at Plaintiff. OSUF ¶ 13; ECF 89-5.

9.      McClure was an hourly employee. OSUF ¶ 28.

10.     McClure did not sign an employment agreement, non-disclosure agreement, or contract with Plaintiff. OSUF ¶ 21; RSUF ¶ 21.

11.     McClure devoted some time to Plaintiff's marketing efforts as part of his job responsibilities. Reply SUF ¶ 16.

12.     In order to help with accounts and marketing, Clark gave McClure administrative access to Plaintiff's website. OSUF ¶ 25.

Defendant Dax Biederman

13.     As of early 2016, Defendant Dax Biederman ("Biederman") had fourteen years of experience in the construction industry, mostly at J.R. Butler, where he provided training in OSHA, construction, general industry safety, and human resources. OSUF ¶¶ 17–18.

14.     Biederman took materials from J.R. Butler to Plaintiff. ECF 83-14 at ¶ 35.

15.     In March 2016, Biederman received an offer letter from Plaintiff. OSUF ¶ 20. He signed no other employment or non-disclosure agreements. RSUF ¶ 21.

16.     Plaintiff gave Biederman the salaried position of Senior Safety Consultant. OSUF ¶¶ 31–32.

Defendant Scott Seppers

17.     As of early 2017, Defendant Scott Seppers ("Seppers") had seventeen years of experience in the construction industry, including at LPR and RK Steel. OSUF ¶ 23.

18.    In 2017, Plaintiff hired Seppers as a Consultant, paying him on an hourly basis. OSUF ¶¶ 29–30.

19.    Seppers received an offer letter from Plaintiff. OSUF ¶ 20. He signed no other employment or non-disclosure agreements. RSUF ¶ 21.

B.    Individual Defendants' Employment

20.    Plaintiff hired the Individual Defendants to develop and conduct training as well as to conduct safety inspections. McClure also performed technology-related services. Reply SUF ¶ 33.

21.    Plaintiff had no employee handbooks. OSUF ¶ 26.

22.    Plaintiff did not ask Defendants to sign any agreement regarding the secrecy, confidentiality, or proprietary nature of any documents. OSUF ¶ 56.

23.    Plaintiff had no written policies regarding confidential or proprietary information. RSUF ¶¶ 123–24.

24.    Defendants received their training credentials and certifications in their work email accounts. In the safety training world, such credentials are associated with the person, not the employer. OSUF ¶¶ 60–61.

McClure

25.    McClure had a work email account which he could access from his work devices (computer and phone) as well as from his personal phone for a period of time. RSUF ¶¶ 46–47.

26.    McClure deleted emails as a regular routine, such as after completing a task. OSUF ¶¶ 48–49.

27.    McClure received personal emails in his work email account. OSUF ¶ 50.

28.    In 2018, McClure created a personal Dropbox account without direction or express pre-approval from Plaintiff. He used it to transfer large files to Plaintiff's clients. OSUF ¶¶ 51–52;

RSUF ¶¶ 51–52; Reply SUF ¶ 52. McClure also used his Dropbox account for personal purposes. OSUF ¶ 53.

29.     McClure received from Plaintiff an external hard drive. Reply SUF ¶ 54. McClure kept personal documents and photos on an external hard drive. OSUF ¶ 55.

30.     McClure holds a variety of professional certifications. OSUF ¶¶ 62–64.

31.     McClure's work required regular travel. OSUF ¶ 67.

32.     In August 2018, McClure traveled to Malaysia and Vietnam to train Plaintiff's clients. McClure did not use Plaintiff's VPN computer access, because he had his training materials saved to an external drive. OSUF ¶¶ 68–69; Reply SUF ¶ 69(b). McClure copied materials from Plaintiff's shared drive ("S-Drive") to the external drive for use on the trip. OSUF ¶ 70.

<u>Biederman</u>

33.     Biederman had a work email account for which he had authorized access beginning on the date of hire and ending on November 1, 2018 when he left. He could access his work email account from his work devices (computers and phone). However, he did not have access to his work email account on his personal computer or phone. If he needed access to photos, flight information, or itineraries outside of work, he saved them to his iCloud account or emailed them to his personal email account. He received personal emails in his work email account. RSUF ¶¶ 34–39, 43.

34.     Biederman deleted emails as part of his daily work routine. Reply SUF ¶ 44.

35.     Biederman used his personal iTunes and iCloud accounts on his work computer. Reply SUF ¶¶ 40–41.

36.     A personal iCloud account might back up data from Plaintiff's computer if "synced" with it. Reply SUF ¶ 42.

37.    Biederman has numerous certifications, qualifications, and credentials including an Ahern Train the Trainer Qualification for Aerial Lift and Forklift. OSUF ¶ 66.

38.    Biederman did not train in the subject of rigging or use any rigging equipment while at Plaintiff. OSUF ¶ 98.

Seppers

39.    NCCER accredited Seppers as a trainer. OSUF ¶ 65.

40.    Seppers purchased for himself an external hard drive and saved to it both personal and work-related materials. He copied documents from Plaintiff's S-Drive to his external drive, totaling two terabytes of data. OSUF ¶ 72; RSUF ¶ 71.

41.    Seppers used his personal iCloud account to back up data from his work phone and iPad. OSUF ¶ 76.

Plaintiff's IT System

42.    Plaintiff used an Office 365 email account. When a user deleted an email, it moved to the "Deleted Items" folder. The email would remain there until a user deleted it from that folder. The system would save the now "purged" email for fourteen days during which time it remained recoverable. Afterwards it became permanently deleted. OSUF ¶¶ 108–12.

43.    Plaintiff alleges that all of its emails have value because they are business records. OSUF ¶ 121.

44.    As of November 1, 2018, Plaintiff kept three external drives as back-ups for its servers and hard drives. The office manager (who is neither an owner nor officer) kept one external drive at her home. OSUF ¶¶ 113–16.

45.    Plaintiff has firewalls and local administrative passwords. OSUF ¶ 116.

46.     Each employee had his or her own C-Drive and own password for access to it. Reply SUF ¶ 119.

47.     Access to folders on the S-Drive that contained sensitive information was restricted. Reply SUF ¶ 120.

Plaintiff's Physical Property

48.     Clark had several Exofit Fall Protection Harnesses. OSUF ¶ 81.

49.     In 2017, Plaintiff purchased System 99 for $989.03. OSUF ¶ 84.

50.     Plaintiff had fall rescue devices, including a rescue ladder. OSUF ¶ 92.

51.     Plaintiff bought rigging training supplies in April 2016 and August 2018 for a total of $1,052.02. OSUF ¶ 94.

52.     Plaintiff admits that it stored its French Creek System 99 and associated equipment as well as rescue pole and French Creek Fall Protection Harness in the crane yard. ECF 93 at ¶ 56.

53.     Plaintiff is unaware of the exact date on which the items listed in response to Interrogatory 14 were last seen in its office. RSUF ¶ 97.

54.     Plaintiff had not taken an inventory count before Defendants left. ECF 89-11.

Plaintiff's Alleged Trade Secrets

55.     Plaintiff identifies five categories of trade secrets that it alleges Defendants misappropriated:

        (1)     PowerPoint Presentations (OSUF ¶ 122),

        (2)     NCCER Ironworker Apprenticeship Training Materials (OSUF ¶ 122),

        (3)     financial, business, scientific, technical, economic, and engineering data and information (OSUF ¶ 149),

        (4)     client and customer information (OSUF ¶ 150), and

(5)      pricing lists and information (OSUF ¶ 165).

56.      Plaintiff alleges that the two terabytes of data copied from its S-Drive contained the above trade secrets. Plaintiff created an index of folders and files to organize the claimed trade secret information. ECF 106 at 4.

Plaintiff's PowerPoints and Training Materials

57.      Plaintiff's employees used PowerPoints and YouTube videos for their training programs. OSUF ¶ 99. The PowerPoints were on the S-Drive. OSUF ¶ 102. Plaintiff also gave training program attendees paper copies of the PowerPoints as handouts. OSUF ¶ 103.

58.      Plaintiff did not require class attendees to sign confidentiality statements, waivers, or other documents. RSUF ¶ 104. Furthermore, Plaintiff did not notify attendees that the PowerPoint information was confidential or proprietary. OSUF ¶ 105.

59.      Employees could indicate work time spent on the task of creating and updating PowerPoints. OSUF ¶¶ 106–07; RSUF ¶¶ 106–07.

60.      Plaintiff's PowerPoint presentations have at least some public or third-party licensed content or basis. OSUF ¶¶ 130–31, 133–34; RSUF ¶¶ 130-31, 133–34.

61.      Plaintiff does not have exact dates when it created its PowerPoints. RSUF ¶ 145.

62.      Plaintiff does not allege specific dollar values for its PowerPoints. RSUF ¶ 148.

63.      Plaintiff and LPR worked on the NCCER apprenticeship program materials in 2012. McClure also contributed to them but to a disputed extent. RSUF ¶ 142.

64.      NCCER provides PowerPoints to licensed instructors for free. OSUF ¶ 143.

65.      Plaintiff's website has a list of classes taught and attendees. RSUF ¶ 146.

Client and Customer Information

66.     Plaintiff maintains a list of clients, their contact information, and description of services provided on a platform called Constant Contact. OSUF ¶¶ 152–53. It has had a client and customer list since it began operations. OSUF ¶ 164.

67.     Plaintiff has another list of clients and/or attendees on its website that is searchable. OSUF ¶ 154; RSUF ¶¶ 154–55.

68.     Plaintiff does not give a specific dollar value for the cost and effort spent on its client list. RSUF ¶ 163.

69.     Nine of Plaintiff's clients left after November 1, 2018. OSUF ¶ 151.

Pricing Lists and Information

70.     Plaintiff alleges that it maintains prices for a wide range of services, and that the prices are based on a wide variety of factors. OSUF ¶¶ 166–70.

71.     Plaintiff maintains its class prices on its website. OSUF ¶ 171.

Defendants Leave Plaintiff

72.     Defendants began to discuss starting their own company when they still worked for Plaintiff. RSUF ¶ 174. From late September and into October 2018, they made plans to leave. Plaintiff's Additional Statement of Disputed Material Facts from its Response ¶ 7; Defendants' Statement of Additional Facts from their Reply ¶ 5.

73.     At some point in fall 2018, McClure sent First Solar a proposal for Plaintiff's rigging training program. First Solar declined the proposal, but it offered McClure a job. OSUF ¶¶ 176–78.

74.     On September 29, 2018, Defendants filed Articles of Incorporation for their company, Trivent Safety Consulting Corp. ("Trivent"). On September 30, 2018, they established a Trivent

group chat. In September or October 2018, they established social media accounts, a domain name, and email address for Trivent, and they met at least five times about Trivent. OSUF ¶¶ 179–81, 183–84.

75.     A couple of weeks before he left Plaintiff, McClure copied personal documents from his work computer, and he deleted personal emails from his work email account. OSUF ¶¶ 185–86, 271.

76.     In the week before he left Plaintiff, Biederman copied personal documents from his work computer, and he deleted personal emails. OSUF ¶¶ 187–88, 271.

77.     Seppers was in the process of setting up a class by Plaintiff for ThyssenKrupp when he, along with McClure and Biederman, gave notice that their employment was ending. Seppers forwarded one of ThyssenKrupp's emails to himself. OSUF ¶¶ 189–92.

78.     In October 2018, a former co-worker and personal friend, Felix M., emailed Biederman a testimonial. OSUF ¶¶ 196–98.

79.     On October 25, 2018, Seppers requested a testimonial from Brian D. OSUF ¶ 199.

80.     On October 31, 2018, McClure called Quality Steel Service to say that he was leaving Plaintiff. OSUF ¶ 201.

81.     At some time in October 2018, Biederman informed J.R. Butler that he was leaving Plaintiff and starting Trivent. OSUF ¶ 204.

82.     On November 1, 2018, Defendants informed Clark that they were leaving to pursue other opportunities. OSUF ¶ 206.

83.     Clark accepted everything that the three turned in. Clark escorted them out and wished them best of luck in their future endeavors. OSUF ¶¶ 218–19.

84.     Defendants' email access ended on November 1, 2018. OSUF ¶¶ 227–28.

85.     After he arrived home on November 1, 2018, McClure logged into Plaintiff's website and social media accounts, removed bios, and change the passwords to "password." OSUF ¶ 229; Reply SUF ¶ 25.

86.     At 10:00 a.m. on November 2, 2018, Seppers returned his company credit card. OSUF ¶ 231.

87.     On November 10, 2018, McClure removed himself as administrator from Plaintiff's LinkedIn account. OSUF ¶¶ 316–19.

88.     On or around November 16, 2018, McClure removed all files related to Plaintiff from his personal Dropbox; saved them to an external drive; and gave it to his attorneys. OSUF ¶¶ 322–23.

89.     Seppers likewise gave an external hard drive to his attorneys on November 16, 2018. Seppers later accessed it at Plaintiff's request to retrieve the OSHA10 Training agenda. RSUF ¶ 324.

90.     The first known email on Trivent's email server is dated September 29, 2018. Defendants' Statement of Additional Facts from their Reply ¶ 5.

91.     On November 5, 2018, Trivent officially opened for business. RSUF ¶ 306.

92.     Biederman currently uses a French Creek System 99 borrowed from Colorado Safety Supply. OSUF ¶ 91.

Plaintiff Reacts

93.     On November 12, 2018, Plaintiff asked its IT provider, Aspire Technology Solutions, Inc., ("Aspire") to restore its email accounts, website, and server to their condition before the Defendants had departed. OSUF ¶ 239.

94.     On November 12, 2018, Aspire logged into the work email accounts of McClure and Biederman and manually recovered deleted items. That included a "handful of items" that were in

12

the "Deleted Items" folder. Aspire recovered emails that either had been purged or deleted. Aspire notified Plaintiff's attorneys of the recovery. OSUF ¶¶ 240–44.

95.     On November 12, 2018, Clark asked Aspire to look for particular file folders. Aspire initially could not find them in the server back-ups. Aspire billed $220 for a telephone call with Plaintiff's attorneys. OSUF ¶¶ 248–51; ECF 83-48 at 1.

96.     On November 19, 2018, Clark found other information believed missing from a recovered directory. OSUF ¶ 256.

97.     On November 30, 2018, Clark told Aspire that the NCCER Ironworker\Powerpoints\Level 3 and Erectors\ACS data were missing. OSUF ¶ 257.

98.     On December 26, 2018, Aspire reported that it was unable to find any presentation files with "spider" or "spyder" in the name. Aspire also reported finding no files that had been last modified in October 2018 with "scaffolding" in the name. OSUF ¶ 260; ECF 83-45 at 2.

99.     On February 6, 2019, Aspire closed the ticket on Plaintiff's request to find data in the server back-ups. ECF 83-45 at 1. Aspire had spent eight hours on server data recovery for which it billed $880. OSUF ¶ 262; ECF 83-48 at 3.

100.    On February 4, 2019, Aspire spoke with Plaintiff's attorneys for which it billed $55. OSUF ¶ 264; ECF 83-50 at 1.

101.    On October 17, 2019, Aspire responded to information requests from Plaintiff's attorneys for which it billed $110. OSUF ¶ 268; ECF 83-53.

102.    On April 21, 2020, Aspire billed $252.50 for assisting a forensics team with copying Plaintiff's servers. OSUF ¶ 269.

103.     On November 13, 2018, Forensic Pursuit imaged all of Defendants' work devices. Forensic Pursuit billed $1,750 for McClure's iPhone, laptop, and desktop; $1,150[1] for Biederman's smartphone and laptop; and $1,650 for Seppers' iPad, iPhone, and laptop. It billed $300 for each of Defendants' email accounts, and it billed $498.75 to export the images and create a spreadsheet. RSUF ¶ 266; ECF 83-52.

104.     Forensic Pursuit exported email archives for $570 and performed a complete file email analysis on Defendants' email accounts for $285 each. OSUF ¶ 265; ECF 83-51.

105.     Plaintiff has submitted unauthenticated invoices from Forensic Pursuit that show a total of $3,403.73 charged for services related to recovering McClure's emails. OSUF ¶ 265–66.

106.     Altogether, Plaintiff recovered 40,000 pages of deleted emails. Of them, only 9,300 pages reference any of Defendants' email addresses. OSUF ¶¶ 245–46; RSUP ¶¶ 245–46.

The Parties Go to the Authorities

107.     On November 16, 2018, Plaintiff went to the Frederick Police Department accusing the Defendants of taking its property when they quit. The police requested "a list of items that are missing, the location/time/date the items were last seen, receipts/cost of the items and proof from the website provider that [its] website was accessed and changed without authorization." ECF 89-6.

108.     On November 29, 2018, Plaintiff filed a supplemental police report accusing the Defendants of various kinds of theft and unauthorized website access. ECF 89-7.

---

[1] Defendants say that Forensic Pursuit charged $1,100 to image Biederman's smartphone and laptop. OSUF ¶ 266. Plaintiff says that particular charge was $1,150. RSUF ¶ 266. Defendants did not reply to Plaintiff's clarification. Reply SUF ¶ 266.

109.    On December 14, 2018, Plaintiff provided invoices for several items shipped to its Denver office. The police continued to request the location, date last seen, and serial numbers of missing property. ECF 89-9.

110.    On December 20, 2018, Plaintiff informed the police that it had conducted an inventory check immediately after Defendants' departure. ECF 89-10.

111.    On January 18, 2019, Plaintiff filed a supplemental report repeating its accusations. It also stated that all of the missing items had been stored in an unlocked storage room to which all employees had access. When the officer explained that no criminal charges would be filed, Plaintiff said that it would proceed with a civil case. ECF 89-11.

112.    Plaintiff admits that it had no further communications with the police. ECF 93 at ¶ 61.

113.    On April 24, 2019, the police came to Trivent's business address to speak with Defendants. The receptionist explained that meetings were by appointment only. The police took no further action. ECF 89-13.

114.    On July 25, 2019, Defendants filed complaints with the Colorado Department of Labor and Employment ("CDLE") for nonpayment of their final paychecks. On August 8, 2019, Plaintiff issued paychecks to Defendants. ECF 89-12.

115.    Also in August 2019, Plaintiff told the CDLE "that it understood that the police investigation was still ongoing," although the CDLE found "the basis for that belief [to be] questionable." ECF 89-12 at 11.

116.    On December 3, 2019, the CDLE awarded Biederman additional income and awarded all three Defendants penalty payments. ECF 89-12.

117.    On June 16, 2020, Plaintiff appealed the CDLE's decision to Denver District Court. ECF 89-17.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—the showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).  Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *See Johnson v. Weld Cty.,* 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *See Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in its complaint, but must respond with specific facts showing a genuine factual issue for trial. *See* Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

## I.      Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) ("CFAA"), creates a civil cause of action to redress harm that a defendant causes after wrongfully accessing a protected computer. Plaintiff brings three CFAA claims: (1) Biederman and McClure violated § 1030(a)(4) by deleting emails; (2) McClure violated § 1030(a)(5)(B) by deleting items on its website; and (3) all three individual Defendants violated §§ 1030(a)(4) and (a)(5) regarding S-Drive data. Plaintiff asserts similar Negligence Per Se/Colorado Cybercrime Statute claims based on C.R.S. § 18-5.5-102(1)(a)-(c). The state statute closely tracks the language of the CFAA.

A.    Deleting Emails

Plaintiff alleges that "Biederman and McClure deleted thousands of emails for the time period between April 2018 and November 1, 2018 in an effort to cover their tracks and hide the fact that they were preparing to compete with [it] and planning to take [its] trade secrets and proprietary information." ECF 95 at 61. Section 1030(a)(4) requires a showing that the two Defendants: (1) accessed Plaintiff's protected computer (2) without authorization or exceeding such authorization that was granted, (3) knowingly and with intent to defraud, and thereby (4) furthered the intended fraud and obtained anything of value, causing (5) a loss to Plaintiff during any one year period aggregating at least $5,000 in value. *See LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

The Court begins with element (2) regarding authorization. In its Order on Defendants' Motion to Dismiss (ECF 41 at 9), the Court found plausible the allegation that a defendant potentially violates § 1030(a)(4) if he deletes information that he was not permitted to delete. However, Plaintiff has not presented evidence of what terms of use the Defendants actually violated. In other words, there is no evidence that Plaintiff had "declared off-limits" the deletion of work emails. *See Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F. Supp. 3d 961, 973, 983 (D. Colo. 2016). "Whether an employee exceeds authorized access depends on the computer access restrictions imposed by his employer." *Christie v. Nat'l Inst. for Newman Studies*, No. 16-6572 (FLW), 2019 WL 1916204, at *5 (D.N.J. 2019).

Plaintiff relies on *Int'l Airport Center, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006), for the principle that authorization may be deemed lost if the defendant acted with improper motive. However, *Citrin* is distinguishable on the facts. His employer gave him a laptop to record data for his work identifying potential acquisition targets. In breach of his employment contract, he left

and formed a competing business. Before he returned his laptop, he deleted all of the data on it (both the data that he had collected and data that would have revealed his improper conduct), and he used a special software to make the deleted data unrecoverable. *See id.* at 419. Moreover, *Citrin* was decided under a broad construction of element (2) that covers both the act of accessing nonpermitted data and accessing permitted data with the intent and purpose of misusing it. District courts in the Tenth Circuit follow the narrower construction of the Second, Fourth, and Ninth Circuits who say that someone violates the statute only if he accesses nonpermitted data. *See Central Bank & Trust v. Smith*, 215 F. Supp. 3d 1226, 1231–33 (D. Wyo. 2016) (explaining the two different ways to construe the element and favoring the narrower one). Clark states that "[w]hen employees delete relevant emails permanently and do not inform me of the deletion, this greatly impacts [Plaintiff's] business." ECF 95-3 at ¶ 8. However, Clark's statement alone does not suffice to create a genuine dispute of fact over whether Defendants acted contrary to an express email deletion policy. Without showing how Biederman and McClure acted contrary to terms of access or use, Plaintiff provides an insufficient basis to avoid summary judgment.

Regarding element (3), the Court notes that not all of the thousands of deleted emails concerned an impermissible purpose. Undisputed evidence shows that at least some of them had no relationship to the alleged scheme. Plaintiff submits at ECF 95-16 through ECF 95-18 and at ECF 95-51 example deleted emails that it says could be construed as revealing a plan to leave and compete with it. ECF 95 at 63. Of them, Biederman or McClure are party to only three. There is no evidence when those three emails were deleted or by whom.

With respect to element (5), McClure argues that Plaintiff does not meet the threshold loss amount needed to bring the claim against him. Plaintiff has a private cause of action only if it suffered a loss during any one-year period "aggregating at least $5,000 in value." *See* 18 U.S.C. §

1030(c)(4)(A)(i)(I). Plaintiff says that it incurred a total of $34,164.52 in losses for all nine of its CFAA claims against all Defendants. However, Plaintiff does not explain how it may combine all of its claimed losses from each of the different violations. While some case law permits combining losses from multiple intrusions that comprise one violation, *see Creative Computing v. GetLoaded.com, LLC*, 386 F.3d 930, 934–35 (9th Cir. 2004), *Freedom Bank Mortg. Servs., Inc. v. O'Harra*, No. 2:11-cv-01073, 2012 WL 3862209, at *6–7 (S.D. Ohio 2012), Plaintiff cites no legal authority for combining losses from different violations by different Defendants. Consequently, Plaintiff has not established amounts that are specific either to McClure alone or to Biederman and McClure together for the alleged § 1030(a)(4) violation of deleting emails.

In addition, only certain kinds of losses are permitted. A "loss" includes "the cost of responding to an offense, conducting a damage assessment, and restoring the data . . . to its condition prior to the offense, and [costs resulting from] interruption of service." 18 U.S.C. § 1030(e)(11). The loss also must be "reasonable." For example, it must reasonably relate to what was needed to take investigatory or corrective measures. *See Animators at Law, Inc. v. Capital Legal Solutions, LLC*, 786 F. Supp. 2d 1114, 1121 (E.D. Va. 2011). Legal fees that are not directly attributable to restoring Plaintiff's computer access are excluded. *See Hamilton Grp. Funding, Inc. v. Basel*, No. 16-61145-CIV, 2019 WL 3765340, at *4–5 (S.D. Fla. 2019) (citing case law). The party claiming the loss must support it with reliable documentation. *See Glob. Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 649 (E.D. Va. 2010).

As McClure calculates in the Reply (ECF 98 at 50–51), Aspire's invoices total $1,155.00 for services related to recovering his deleted emails. ECF 83-48 at 1, 3; ECF 83-50. There are also invoices from Forensic Pursuit. McClure objects that they are unauthenticated, and that Plaintiff does not show how the expense was reasonably incurred. McClure nevertheless concedes in the

Reply (ECF 98 at 52–53) that the invoices show a total of $3,403.75 billed for services related to him. ECF 83-51; ECF 83-52. That yields a total of $4,558.75 in losses attributable to McClure, below the $5,000 threshold minimum.

The additional expenses that Plaintiff includes in its loss figure do not help it to reach the statutory minimum. Plaintiff does not explain how the $10,614 in fees that its counsel billed for working with Aspire and Forensic Pursuit (ECF 95-3 at 12) is includable. The invoice from Marathon Document Solutions, Inc., (ECF 95-3 at 14) is dated after the one-year period. Clark makes the conclusory statement that he "personally spent approximately 100 hours to investigate MSC's losses due to McClure's, Seppers', and Biederman's misconduct, which cost MSC approximately $10,000." ECF 93-3 at 12–13. Without explaining what the 100 hours consisted of (including specific tasks accomplished) or recording his hours in any fashion whatsoever, or for that matter providing a foundation for the value of his time, this type of evidence is insufficient for a "reasonable jury to conclude that this alleged lost time was a CFAA-qualifying loss." *Glob. Policy Partners,* 686 F. Supp. 2d at 651. *See also id.* at n.13 (discussing the need to explain the hourly rate). The Court finds *Glob. Policy Partners* to be persuasive authority on this matter and consistent with the other cited cases regarding CFAA loss. Therefore, Plaintiff does not show a material dispute of fact concerning element (5) with respect to McClure.

B.    Changing Plaintiff's Website or Administrative Pages

In the prior ruling (ECF 41 at 9–10), the Court found that Plaintiff plausibly alleged violations of §§ 1030(a)(4) and (a)(5)(B) against McClure when, after his termination, he accessed its online website management system and deleted data from it. ECF 95 at 64. On summary judgment, McClure argues that Plaintiff shows no genuine issue of fact over the elements required to support either claim.

To succeed on the § 1030(a)(5)(B) claim, there must be evidence that McClure: (1) intentionally (2) accessed a protected computer (3) without (or exceeding) authorization, and as a result (4) has recklessly caused damage, (5) resulting in a loss of $5,000 in value in a one-year period. *See* 18 U.S.C. §§ 1030(a)(5)(B)–(c)(4)(A)(i). There is no dispute that McClure had been managing those sites as an administrator. McClure concedes that he accessed Plaintiff's website and social media pages after he was fired for the purpose of changing his passwords and administrative credentials. He also removed the "bios" of him, Biederman, and Seppers from Plaintiff's website. Later, on November 10, 2018, he severed his personal LinkedIn account from Plaintiff's LinkedIn account and removed himself as an administrator. Clark denies giving McClure permission to access the websites or accounts or to make any of those changes after his employment ended. ECF 95-3 at ¶¶ 51–55. McClure disputes using "a protected computer," that is, one of Plaintiff's work computers, to make the changes. Regardless of whether Plaintiff can prevail on the first three elements, it does not show a dispute of fact over the last two.

Plaintiff submits no evidence of "damage" to support element (4). McClure concedes making two kinds of changes. First, McClure made changes for the purpose of giving up his administrator's access and to make it easier for Plaintiff to take over. Clark says that McClure's actions were unnecessary because he also was an administrator able to make the changes. ECF 95-3 at ¶¶ 53–54. Even if it were unnecessary, Plaintiff does not demonstrate how McClure's actions caused damage. Second, McClure deleted the Defendants' bios. Plaintiff argues that "[a]s a result, clients or potential clients viewing [its] website saw only three employees (rather than six), therefore broadcasting to such clients and potential clients the staffing difficulties [Plaintiff] experienced after [their] abrupt departure." ECF 95 at 64. However, no evidence corroborates that Plaintiff actually suffered harm in that form. Consequently, Plaintiff shows no genuine dispute

over whether it suffered any damage at all, much less whether McClure recklessly sought to cause damage. Alternatively, if considered as a § 1030(a)(4) claim, Plaintiff likewise leaves unsubstantiated how the changes furthered a fraud or conveyed to McClure anything of value.

Plaintiff does not submit evidence that McClure's actions caused it $5,000 in losses during a one-year period to meet element (5). It does not show what work Aspire or Forensic Pursuit did to correct the damage that his actions allegedly caused to its website or social media pages. It does not quantify any other kind of loss, such as reputational harm. In addition, Plaintiff does not address in its Response the loss amount issue. ECF 95 at 64. Its failure to establish the jurisdictional threshold precludes its ability to proceed against McClure on this allegation whether brought under § 1030(a)(4) or § 1030(a)(5)(B).

C.      Copying from the S-Drive

Plaintiff alleges that all three individual Defendants violated §§ 1030(a)(4) and (a)(5)(B) when they copied data from its S-Drive. Both causes of action require Plaintiff to prove that Defendants acted without authorization or exceeded authorized access.

Plaintiff stresses that "the question of 'access' is not in dispute." ECF 95 at 56. The Court agrees, but contrary to Plaintiff's assertion, the record does not establish that their access was unauthorized. Defendants did have access to most data on the S-Drive. "While all employees had access to the shared drive, employee access to certain sensitive data was restricted." ECF 95-3 at ¶ 8. "While employed, McClure, Biederman, and Seppers had protected access to [Plaintiff's] entire S-Drive." ECF 95-3 at ¶ 26. The dispositive point is that Plaintiff does not show how the act of copying the data was off-limits or otherwise prohibited by an affirmative policy. *See Cloudpath*, 157 F. Supp. 3d at 973 (construing the statute's use of the term "exceeds authorized access" in those terms).

Instead, Plaintiff relies on *Citrin* to support this element, but as explained above, *Citrin* applies the broader way of construing it. Plaintiff also relies heavily on the quantity of data copied (two terabytes) and Defendants' alleged use of copied data for an improper purpose. However, those fact allegations are immaterial to the legal question of unlawful access. *See Dresser-Rand Co. v. Jones*, 957 F. Supp. 2d 610, 621 (E.D. Pa. 2013) (holding that because the defendants "had authorization to access their work computers, they did not hack into them when they downloaded files. Their alleged misuse of the files may have remedies under other laws, but not under the CFAA."). Plaintiff does not identify in its Response any workplace policy or instruction that denied Defendants permission to copy data from the S-Drive. The terms of computer use that Clark discusses in his Declaration are application specific. Plaintiff did not permit employees to sync their personal iCloud accounts with any company computer. ECF 95-3 at ¶ 13. Plaintiff's iPad computers lacked access to any server. *Id*. at ¶ 14. Plaintiff permitted copying of training materials to external drives when employees lacked reliable internet access at training sites. *Id*. ¶ 20. Clark states that he "never knowingly permitted employees to use their own external hard drives to copy documents." *Id*. at ¶ 21. However, without further explanation, the assertions do not go so far as to show that Defendants acted contrary to an express prohibition or exceeded the scope of permitted access. The lack of explicit authorization does not establish the converse.

The § 1030(a)(5)(B) claim fails for an additional reason. There is no evidence that Defendants' act of copying data from the S-Drive caused Plaintiff damage. *See Farmers Ins. Exch. v. Auto Club Group*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (explaining how the statute requires an act of damage such as deleting data, not merely copying data).

D.     Deleting Data from the S-Drive

Plaintiff received from Defendants in discovery at least five internally created policies that it says it could not find otherwise. ECF 95 at 59. There is a dispute of fact over the extent to which NCCER Ironworker Apprenticeship Training materials and ACS data went missing after Defendants' departure. ECF 83 at 64; ECF 95 at 60. If Defendants did cause any of those files to be deleted, then that would constitute damage for § 1030(a)(5)(B) purposes. The next question is whether Defendants deleted files in a way that violated Plaintiff's terms of access and use. For the reasons the Court explains above, there are no facts from which a reasonable factfinder could find that Defendants acted contrary to Plaintiff's authorization or permission, as that element is defined for CFAA purposes, in their use of the S-Drive.

E.     Summary of CFAA Analsyis

Plaintiff alleges that when Defendants left, they deleted emails and copied a large quantity of its data. It further alleges that they did so with the improper motive of giving their newly created competing business an advantage. However, even if both allegations are true, Plaintiff does not present the kind of evidence needed to show a CFAA violation. Whatever improper motive Defendants may have had, Plaintiff has not established that they accessed or used its data in an unauthorized or impermissible way. In other words, the evidence does not show that Defendants "hacked" its data, whether from outside or from within. The need to prove this additional element prevents the CFAA from being used to redress either an employee's disloyal act or the misappropriation of a trade secret. *See Dresser-Rand*, 957 F. Supp. 2d at 615, 618; *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l, Inc.*, 616 F. Supp. 2d 805, 810–13 (N.D. Ill. 2009). In any event, the law provides other causes of action for those theories of wrongdoing.

Therefore, the Court grants summary judgment on all of the CFAA claims as well as on the three Negligence Per Se/Colorado Cybercrime Statute claims of C.R.S. § 18-5.5-102(1)(a)-(c). However, this finding does not affect Plaintiff's Negligence Per Se/Colorado Cybercrime Statute theft claim of C.R.S. § 18-5.5-102(1)(d).

## II.    Trade Secret

Plaintiff brings twenty claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1), ("DTSA") and under the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-102 ("CUTSA"), seeking redress for the alleged misappropriation of its trade secrets. There are three main elements to a DTSA claim. First, Plaintiff must establish the existence of a "trade secret" as the law defines the term, as well as ownership of that trade secret. *See* 18 U.S.C. §§ 1839(3) and (4). Next, Plaintiff must show that Defendants misappropriated that trade secret. *See* 18 U.S.C. § 1839(5). The final element concerns the remedy, whether in the form of an injunction or an award of damages. *See* 18 U.S.C. § 1836(b)(3).

Plaintiff alleges that its S-Drive data was all trade secret materials. Indeed, it claims the totality of its operational functions and how it conducts business as a trade secret. ECF 106-1 at ¶¶ 3, 13. It is undisputed that Defendants copied two terabytes of data from the S-Drive. Plaintiff does not separately identify each document that it claims as a trade secret. Instead of an item-by-item list, it indexed the S-Drive's files and folders, which covers over 650,000 files, and the index itself is hundreds of pages long. *Id.* at 4. Plaintiff groups that indexed information into five categories: (1) PowerPoints and training presentations; (2) NCCER Ironworkers Apprenticeship training materials; (3) client and customer information; (4) pricing lists and information; and (5) financial, business, scientific, technical, economic, and engineering data and information.

Plaintiff provides a general definition for each category. The "Training, PowerPoint and Presentations" category contains "PowerPoint presentations developed by MSC for trainings and presentations for speaking engagements. These files also include lecture presentations obtained by MSC from certain speakers. MSC regularly uses these files to make customized presentations to fit [its] client-specific training and other materials." *Id*. at 6.  The NCCER category covers the Ironworker Apprenticeship Training Materials that Plaintiff "developed and created . . . between August 2016 and April 2017." *Id*. at 8. The client and customer category "includes all client information relevant to each client (except for client billing), such as policies MSC created for clients, client inspection letters, and client OSHA citation records for which MSC provided assistance," as well as "a history of MSC's work for each client." *Id*. at 6. The pricing list category includes "pricing list data [that] includes, among other things, information contained in the 'Proposal' folders." *Id*. at 8. The fifth category includes payroll and timecard information; marketing; the organization structure of the S-Drive itself; and other training-related information. *Id*. at 7.

A "trade secret" is information whose owner has taken reasonable measures to keep secret and whose economic value comes from not being generally known nor readily ascertainable.  *See* 18 U.S.C. §§ 1839(3). CUTSA, whose elements are similar to DTSA, uses six factors to aid the determination of whether a claimed item of information enjoys trade secret protection. They are:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the owner of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990). Case law defines several of the above factors further.

Defendants argue that there is no genuine dispute of material fact over whether any of the categories qualifies as a "trade secret" under the above definition. Plaintiff includes documents that were not treated as protected or confidential and documents that existed in the public domain in their final form. For example, it is undisputed that the training materials were used publicly and given to attendees to keep.

Citing *Rivendell Forest Prods. v. Ga.-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994), Plaintiff relies on the general rule that any doubts over the existence of a trade secret must be resolved in favor of trial. However, Plaintiff does not add much beyond that broad assertion. Regarding the public domain issue, it relies on the general rule that "a trade secret can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but, taken together, may yield a competitive advantage that results in a protectable trade secret." *Zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-cv-00097-PAB-SKC, 2019 WL 4751809, at *2 (D. Colo. 2019). Zvelo's product was a database of website addresses that it categorized and updated. *See id.* at *1. The court found that its trade secret claim over the database compilation to be adequately pleaded even if Zvelo drew from the public domain to create it. The court noted Zvelo's allegations regarding the substantial work that went into creating and maintaining the database, the difficulty of recreating it, and the protective measures taken to protect it (requiring strict confidentiality and non-disclosure agreements for customers and limiting employee access). In comparison, Plaintiff does not provide the equivalent support to show how its data qualifies as a trade secret under that rule.

Regarding efforts to maintain secrecy, Plaintiff refers to Clark's statement that he "had many conversations with Biederman, Seppers, and McClure about MSC's proprietary materials" in which he told them "not to send proprietary materials to clients because they were MSC property." ECF 95-3 at ¶ 38. This alone is insufficient to qualify as an employment rule governing secrecy. Regarding the trade secrets' value, Plaintiff leaves unsubstantiated its assertion that they are "of great value" and give it "a business advantage over competitors that do not have access to, or knowledge of, the confidential information." ECF 95 at 69, n.13.

In other words, Plaintiff does not go past *pleading* the existence of trade secrets in its opposition to summary judgment. Indeed, Plaintiff relies on the prior motion to dismiss ruling in which the Court found that it adequately pleaded the existence of trade secrets. ECF 41 at 13–14. Even if the question of whether a document is a trade secret is intensely factual generally, Plaintiff still must come forward and show how the factfinder could answer it in its favor. *See Hertz v. Luzenac Grp.*, 576 F.3d 1103 (10th Cir. 2009); *Okla. Land Holdings, LLC v. BMR II, LLC*, No. 17-1036-D, 2020 WL 4284806 (W.D. Okla. 2020). *See also Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1107–08 (D. Colo. 2016) (finding plaintiff's evidence sufficient to show a genuine fact dispute over whether its client reports constitute a trade secret but not over its marketing materials which were publicly disclosed). Plaintiff offers no explanation for how the several factors that define a trade secret are met. Further hampering the determination is the sheer volume of information that Plaintiff claims as trade secret. Indeed, it claims trade secret protection over almost all of the data that it had accumulated through November 1, 2018. Plaintiff does not aid the inquiry by offering examples from any of its five categories to illustrate how they are trade secrets.

The Response does not show how the factfinder could find either a general category or any particular document to qualify as a trade secret. The Court therefore grants summary judgment on Plaintiff's DTSA and CUTSA claims. As such, there is no need to determine whether the Response shows a genuine dispute of fact over the misappropriation or damages elements.

## III.     Duty of Loyalty

Plaintiff alleges that Defendants breached their duty of loyalty to it as their employer. To prevail, Plaintiff must establish (1) the existence of a duty of loyalty, (2) the Defendants' breach of that duty, and (3) resulting damages. *See Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993).

As a general rule, a duty of loyalty exists to the extent an employee acts as his employer's agent. *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 492 (Colo. 1989) (applying § 387 of the Restatement (Second) of Agency). Defendants argue that an employment relationship may not always give rise to a duty of loyalty. However, there is sufficient evidence in this case from which the factfinder might find the kind of agent/principal relationship that does impute a duty of loyalty under the general rule.

An employee may be considered an agent and thus have a duty of loyalty to his employer if he "has sufficient authority to act for the employer or access to confidential information." *Id.* For example, an employee who handled aspects of the employer's accounts, supervised the work of others, had ongoing contact with important clients, and personally took care of those clients' needs was found to owe a duty of loyalty. *See Graphic Directions*, 862 P.2d at 1023. There is evidence that describes Defendants' job duties in a similar fashion. Clark says that they were allowed to do business with clients independently and without oversight. ECF 95-3 at ¶ 3. That includes control over class schedules. ECF 95-18. Seppers says that he and Biederman "were in

charge of the mountain run clients." ECF 83-22 at ¶ 34. Defendants themselves recognized that their departure would significantly impair Plaintiff's operations. ECF 95-43, 95-46, 95-53. Therefore, Plaintiff shows a genuine fact dispute over the material question of whether Defendants had sufficient authority and importance to owe it a duty of loyalty.

It would be unfair for an employee to exploit an employment relationship that is based on trust and confidence for his personal advantage. *See Jet Courier*, 771 P.2d at 492. For example, an employee (agent) may not actively compete with his employer (principal) during the employment. Nor may he actively solicit the employer's customers or employees for his competing business. *See Jet Courier*, 771 P.2d at 493–94. On the other hand, there is a countervailing societal "interest in fostering free and vigorous economic competition," and to that end, an employee may prepare for post-employment competition. *See id*. at 493. For example, "an employee may advise current customers that he will be leaving his current employment." *Id*. at 494. The line that separates active competition from mere preparation "may be difficult to discern." *Id*. at 493. Factors to be weighed are the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the extent of any benefits promised or inducements made to obtain their services in the competing business. *See DTC Energy Grp. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1174 (D. Colo. 2019). The employer's actions may be a relevant mitigating factor. *Jet Courier*, 771 P.2d at 498.

Whether an employee crossed that line into active competition and thereby breached the duty of loyalty "is generally a fact-intensive inquiry." *Wells Fargo*, 276 F. Supp. 3d at 1115. Plaintiff cites sufficient evidence to show such a fact dispute. To begin with, it is undisputed that Defendants began planning their departure in late September as emails and text messages show. ECF 95-42 to 95-47. It also is undisputed that around that same time, Defendants incorporated

Trivent and informed some of Plaintiff's clients that they were leaving. Beyond that, the parties dispute what the evidence shows. Plaintiff points out that Trivent generated its first known email on September 29, 2018, (ECF 95-41), and that on October 11, 2018, McClure sent a message to announce "our first major Trivent client." (ECF 95-14). Defendants discussed how to prevent an employee from accompanying them to a training session because they were meeting their accountant afterwards. ECF 95-48. As they neared their departure date, Defendants postponed two training sessions. ECF 95-16, ECF 95-18. Defendants give reasonable explanations for the above actions. However, it will be for the factfinder to decide whether Defendants' actions crossed the line from permissible preparation to active competition and solicitation.

The third element is damages. Defendants complain that Plaintiff neither quantifies the amount of its monetary damages nor demonstrates a causal link. The only damages that Plaintiff mentions in its Response are Defendants' incomes from September to November 2018. "The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of these services may have been properly performed." *Jet Courier*, 771 P.2d at 499. Therefore, Plaintiff may recover the compensation paid for the work time when Defendants were engaged in disloyal acts.

Because there are fact disputes concerning each element, summary judgment is denied on the duty of loyalty claim.

## IV.    Tortious Interference with Prospective Business Relations

Plaintiff says that nine businesses that were its clients before November 1, 2018 were not its clients afterwards. However, that simple fact alone is insufficient support to state a tort claim for interfering with prospective business relations, even if some of those former clients became

Trivent's customers. Plaintiff must show that it lost that business because of Defendants' intentional and improper interference and a reasonable likelihood or probability that they still would be its clients but for Defendants' wrongful actions. *See Hertz*, 576 F.3d at 1119; *Nobody*, 311 F. Supp. 2d at 1117.

Plaintiff relies on two emails that Defendants sent to postpone training sessions. The first email, ECF 95-16, is from Seppers to ThyssenKrupp. On its face, his email says only that he is not free to conduct training sessions until after November 6, 2018. Seppers sent that message from his work email account. Plaintiff contends that the email constitutes a solicitation of ThyssenKrupp because Defendants had planned to quit by then (ECF 95-46), and Seppers forwarded that email to McClure (ECF 95-17). Plaintiff also notes that in the email, Seppers replaced his work telephone number with his personal one. The record contains additional information about Seppers' communication with ThyssenKrupp. Seppers explains that on November 6, 2018, upon its request, he sent it Trivent's pricing list, but ThyssenKrupp decided to stay with Plaintiff. ECF 83-7 at 3. In any event, ThyssenKrupp is not one of the nine clients that Plaintiff alleges it lost after Defendants' departure. ECF 83-37 at 9–10. The second email is from Biederman to Plaintiff's client, J.R. Butler. ECF 95-18. Biederman sent it on Wednesday, October 31, 2018, from his work email account to say that he is not free to teach a class but would contact it again on Monday if his schedule opened up. Plaintiff construes it as a solicitation attempt. J.R. Butler did leave Plaintiff for Trivent.

Plaintiff submits a text message that Biederman sent Seppers on November 3, 2018 (after Defendants' employment had ended) saying that "the anti MSC pro Trivent productions have begun." ECF 95-54. Plaintiff relies on it as evidence of "Defendants' unlawful conduct in making disparaging remarks about MSC and attempting to convince MSC clients and current and

prospective customers to transfer their business to Trivent." ECF 95 at 81. Plaintiff does not explain such a far-reaching inference may be drawn from that one isolated statement between Defendants. Plaintiff does not point to any actual disparaging remarks made publicly to corroborate the allegation that Defendants engaged in that kind of wrongful conduct.

Plaintiff relies on a text message conversation between Seppers and Biederman on January 22, 2019. ECF 95-32. They discussed needing a self-evaluation form for Trivent's aerial lift/fork lift classes, but it is unclear whether they intended to use Plaintiff's version of the form. In any event, Plaintiff does not explain how the conversation shows the intentional and wrongful interference with a business relationship. Nor does Plaintiff identify the client.  By comparison, the Defendants' conversation on November 1, 2018, in which they discuss what price to offer a prospective client, could be supportive of the claim. ECF 95-20.

Defendants dispute whether all nine of the identified clients left Plaintiff during the initial months of Trivent's operations. Of those that actually did leave Plaintiff for Trivent, such as J.R. Butler, Defendants say it was for legitimate, permissible reasons. It will be for the factfinder to decide whose explanation to credit.

To the extent Plaintiff can prove such tortious conduct, Defendants will be liable "for the pecuniary harm" resulting from the loss of the relationship's benefits. *See Hertz*, 576 F.3d at 1119. From the nine identified clients, Plaintiff reports $196,582.37 in total sales in 2017; $96,107.87 for the full year of 2018 (without accounting for sales before and after November 1, 2018); and $2,700 from just three of the nine clients (RK Steel, AAA Waterproofing, and Snowbridge) in 2019. ECF 83-38. Defendants complain about the lack of particularity and supporting documentation. Nevertheless, an inference can be made of monetary loss sufficient to survive summary judgment.

The above disputes of fact preclude summary judgment on the tortious interference claim.

## V.    Theft-Based Claims

Plaintiff brings claims of conversion, civil theft, and trespass to chattels with respect to nine sets of physical equipment, its S-Drive data, and external hard drives. The theft allegation against Biederman also provides the basis for Plaintiff's property trespass claim.

### A.    Physical Equipment

The allegedly stolen equipment falls into three categories. First is the equipment that Biederman kept because he believes it belongs to him. Biederman says that he brought an Exofit Harness collection and a rescue ladder with him when he began working for Plaintiff, and that during the course of his employment, Plaintiff deducted money from his paycheck for a French Creek Fall Protection Harness and Double Leg Lanyard. ECF 83-14 at ¶¶ 112, 116, 121. Clark attests that the French Creek Fall Protection Harness and Double Leg Lanyard belong to Plaintiff, and that Biederman also left with some of its Exofit Harnesses. ECF 95-3 at ¶¶ 30, 59, 61.

Next is the equipment that Defendants admit belongs to Plaintiff. It is undisputed that Plaintiff owned several Exofit Fall Protection Harnesses, "System 99" equipment, fall rescue devices, a rescue ladder, and rigging training supplies. OSUF ¶¶ 81, 84, 92, 94. Biederman does not dispute that he had in his workbox fall protection training and rescue equipment, including "System 99" equipment, that he agrees is Plaintiff's property. Biederman says that he left it behind on his last day. ECF 83-14 at ¶ 122. Later, on November 16, 2018, Seppers returned rigging training equipment that he found in his vehicle. ECF 83-14 at ¶ 147. Therefore, they contend that all of Plaintiff's equipment found in their possession was returned. Plaintiff concedes only that Biederman and Scott returned *some* of its equipment. ECF 95-3 at ¶ 76.

Last is the equipment that Plaintiff says is missing but which Defendants deny possessing. Plaintiff says that it gave Biederman permission to enter its Brighton location to "retrieve only his personal equipment," after which other equipment went missing. ECF 95-3 at ¶¶ 58–60. Defendants say they last saw the Fall Rescue Devices in the storage room at the main office. OSUF ¶ 93. Otherwise, they speculate that Plaintiff must have left equipment behind at its previous Adams County location when it moved to Brighton. Defendants also object to Plaintiff's lack of purchase or inventory records to substantiate the theft allegations.

The civil conversion claim requires Plaintiff to show that it demanded the return of its property. *See Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984). It is unclear what property Plaintiff specifically asked to be returned before it filed its lawsuit. Defendants argue that Plaintiff requested only the return of the System 99 equipment and did not identify any other missing property until discovery. ECF 83 at 109. Plaintiff leaves that argument unaddressed in its Response. However, it does reference a text message conversation from November 14, 2018 in which Biederman discusses equipment found in Seppers' truck. ECF 95-55. Plaintiff infers from it that Biederman or Seppers would have kept the subject equipment had it not demanded the return of its property. The Court also notes Clark's statement that "Biederman has not returned the fall protection equipment to me, even though he has admitted to having it in his possession. Further, the System 99 and its associated equipment are still missing. Biederman did not leave the rescue pole in the Connex and it is still missing." ECF 95-3 at ¶ 62. The above evidence suffices to create a dispute of fact over whether Plaintiff did demand the return of at least some of the equipment.

There are disputes of fact regarding whether Biederman wrongfully possessed Plaintiff's equipment, either under a theory of conversion, civil theft, or trespass to chattels. The Court also

finds sufficient dispute of fact over whether Seppers wrongfully possessed the items found in his truck under the theories of conversion and civil theft. To that extent, summary judgment is denied. However, the Court grants summary judgment in McClure's favor as to the conversion and civil theft claims; Plaintiff does not explain how McClure could be found civilly liable for equipment theft.

The dispute of fact over whether Biederman wrongfully took and kept Plaintiff's equipment also creates a dispute of fact over whether he trespassed onto its property. Plaintiff brings a claim of trespass against him for entering its Brighton property on November 1, 2018. It is undisputed that Plaintiff gave him permission to do so. As Plaintiff frames it in the Response, "Biederman had limited permission to enter its Crane Yard on November 1, 2018 for the sole purpose of retrieving his 'gang box.'" ECF 95 at 88. Plaintiff alleges that the trespass occurred because Biederman also took some of its equipment, and in doing so, he exceeded the scope of his permission to be there. Biederman concedes that the law permits a finding of trespass in that situation. ECF 83 at 112.

B.   Data

Plaintiff accuses Defendants of conversion and civil theft for "taking the contents of [its] S-Drive." ECF 66 at 19–20. In its Response, Plaintiff alleges that Defendants "currently have dominion and control over [its] entire S-Drive, containing all of its documents, information, and data despite [its] requests to return the S-Drive." Plaintiff also alleges that Defendants deprived it of eight specific documents. ECF 95 at 86–87.

Citing *Kaabooworks Servs., LLC v. Pilsl*, No. 17-cv-02530-CMA-KLM, 2018 WL 2984801, at *7 (D. Colo. 2018) and *Abbott Labs. v. Finkel*, No. 17-cv-00894-CMA, 2017 WL 5517399, at *2–3 (D. Colo. 2017), Plaintiff argues that data may be subject of a conversion claim.

It is undisputed that two terabytes of data were copied from the S-Drive, and that for a time Defendants had use of it. Defendants say that on November 16, 2018, they gave custodial possession of external hard drives to their attorneys, and that later in discovery, they disclosed the copied data, including the eight documents, to Plaintiff. ECF 98 at 80.

However, Defendants assert a right of access to the eight documents when they copied them. ECF 98 at 80. They are only returning them as a goodwill gesture. ECF 98 at 80. The Defendants thereby raise the question of whether their act of dominion or ownership over them—and by extension, the S-Drive data on the whole—was authorized. It is the *unauthorized* dominion or ownership of another's property that constitutes conversion. *See Glenn Arms*, 680 P.2d at 1317. On the CFAA claims, the Court grants summary judgment based on the lack of evidence to show how Defendants breached a barrier to access or acted contrary to express instructions when they copied the data. There is no genuine dispute of material fact whether Defendants' act of copying the data was unauthorized or exceeded authorization under that statute's narrow construction. The parties do not discuss what unauthorized dominion or ownership means in the conversion context. While Defendants may not have wrongly accessed the S-Drive for CFAA purposes, there is the potential that they still "stole" data when they copied it for their own use under a conversion theory. Based on the available legal arguments and evidence, the Court finds a genuine dispute of fact whether Defendants unlawfully converted Plaintiff's data when they copied it for their own use.

Plaintiff brings two additional theft-based causes of action. A person commits theft when he "knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception." C.R.S. § 18-4-401(1). Plaintiff brings this as a civil cause of action. *See* C.R.S. § 18-4-405. *See also Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009). Second, Plaintiff alleges a violation of the Colorado Cybercrime Statue, which

concerns "[accessing] any computer, computer network, or computer system, or any part thereof to commit theft." C.R.S. § 18-5.5-102(1)(d). The same disputes of fact also preclude summary judgment on them.

       C.      <u>External Hard Drives</u>

Plaintiff alleges the theft of external hard drives. Plaintiff includes that allegation in its conversion and civil theft claims against all three individual Defendants. Clark attests that Plaintiff "purchased external hard drives for every employee." ECF 95-3 at ¶ 20. It is undisputed that Plaintiff asked Defendants to return their work computer and devices. OSUF at ¶ 212. That request reasonably could be construed to include external hard drives. McClure and Seppers say that they used their own personal external hard drives during their employment. ECF 83-12 at ¶ 55; ECF 83-22 at ¶ 10. Because Plaintiff limits its Response to only Seppers' external hard drive (ECF 95 at 87), it shows a genuine dispute of fact only with respect to him. Therefore, summary judgment is granted in favor of McClure and Biederman on Plaintiff's external hard drive theft claims.

**VI.**    **Misrepresentation (Counterclaims)**

McClure and Biederman allege that they acted to their detriment on a promise of ownership in the company. They seek redress under theories of both intentional and negligent misrepresentation, and they seek to hold Clark (the person who made the statements) and Plaintiff (the entity on whose behalf Clark acted) liable.

For McClure and Biederman to prevail on their *intentional* misrepresentation counterclaim, they must prove that Clark (1) made a false representation of material fact, (2) knowing that it was false, and (3) with the intention that they act upon it. *See Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013). A fact is material "if a reasonable person under the circumstances would attach importance to it in determining his or her course of action." *Rocky Mountain Expl.*

*Inc., v. Davis Graham & Stubbs, LLP*, 420 P.3d 223, 234 (Colo. 2018). McClure and Biederman also must prove that they (4) were ignorant of the statement's falsity and (5) relied upon it to their detriment. *See Bristol Bay*, 312 P.3d at 1160. Element (5) requires them to demonstrate actual reliance, the reasonableness of that reliance, and resulting damages. *See id.*

To prevail on their *negligent* misrepresentation counterclaim, McClure and Biederman must establish that Clark (1) in the course of his business, profession, or employment (2) misrepresented a material fact, without reasonable care, (3) for their guidance, (4) with knowledge that they would rely upon it. They also must establish (5) their justifiable reliance on the misrepresentation to their detriment. *See Hardy v. Flood*, No. 17-cv-00677-CMA-NRN, 2019 WL 937708, at *4 (D. Colo. 2019). "[T]he tort . . . is intended to provide a remedy for, and is in fact limited to, money losses due to misrepresentation in a business transaction." *Allen v. Steele*, 252 P.3d 476, 484 (Colo. 2011) (internal citation and emphasis omitted).

McClure says that the expectation of a future ownership interest persuaded him to leave his prior employer, LPR, to work for Plaintiff for substantially less income. ECF 89-1 at 3–5, 14; ECF 83-12 at ¶¶ 29–33; ECF 83-9 at 11. For the same reason, McClure says that he performed technology and marketing-related tasks for Plaintiff without compensation. ECF 83-12 at ¶¶ 36, 39, 41. McClure understood that he had to wait a year while Plaintiff paid off a business loan before he would receive a stake in the company. ECF 83-12 at ¶ 31. At one point, he was allegedly promised a ten percent share. ECF 89-1 at 5.

Biederman also alleges that he left his prior employer to work for Plaintiff on the expectation of equity at some point in the future. On December 16, 2015, Biederman emailed Clark about his upcoming employment start date with Plaintiff. ECF 93-5. On March 7, 2016, Biederman signed a Letter of Offer of Employment. ECF 93-6. When Biederman left J.R. Butler, his income

was $85,000 plus benefits. His salary at Plaintiff after the probationary period was $80,000. ECF 83-14 at ¶ 132–33. Biederman says that he took the lower salary because he saw the potential for a larger salary or ownership later. ECF 89-2 at 4. From an early point in their relationship, Clark had spoken about retirement and the potential of Biederman obtaining an ownership stake in Plaintiff. ECF 83-14 at ¶ 135. The evidence could support the inference that they discussed ownership *before* Biederman began working for Plaintiff. In 2018, Biederman became frustrated over the lack of a raise, but he held out on the expectation that he would become a part owner by year's end. ECF 83-14 at ¶ 65.

McClure and Biederman say that they, along with a third co-worker, discussed ownership with Clark at a meeting in December 2017. ECF 83-12 at ¶ 38(e); ECF 83-13 at 12. Clark explained that he was making plans, and that by the end of 2018, they would become part-owners. ECF 83-14 at ¶ 64. The subject of receiving an ownership share was discussed on different occasions over the course of 2018. ECF 83-9 at 11. Then, in August 2018, Clark informed McClure and Biederman that he had changed his mind and would be offering no ownership share after all. ECF 83-14 at ¶ 66; ECF 83-13 at 12; ECF 83-9 at 12.

Plaintiff paints a completely different picture. Citing emails with McClure (ECF 93-2, 93-3) and Biederman (ECF 93-5, 93-10, 93-11), Plaintiff contends that it was they who approached Clark about working for Plaintiff, not the other way around. Clark denies ever offering or promising them any ownership interest in Plaintiff at any time or for any purpose. ECF 93-1. However, in a police report dated January 18, 2019, Clark recalled that in early 2018, the Defendants had asked to become partners, and in July 2018, after thinking about it for several months, he answered no but said he would keep it in mind. ECF 89-11. Plaintiff argues that

Defendants show only vague statements or plans about potential ownership or simply their hope to become part owners eventually.

Much of the evidence on the misrepresentation claims consists of the parties' differing version of events. There is a genuine dispute of fact whether Clark promised McClure and Biederman an ownership stake (whether in exchange for their services or as a buy-in option) that played a role, at least in part, in causing them to start working for Plaintiff. They contend that the misrepresentation can be inferred from the reduced income that they accepted, the regularity of the topic's discussion, their growing frustration, and from their quick departure after Clark's refusal. Because the alleged misrepresentation is a promise of future action, Defendants also must prove that Clark made that promise knowing that he would not follow through (intentional misrepresentation) or should have known that he later would change his mind (negligent misrepresentation). Defendants argue that the factfinder could infer that element from how Plaintiff benefitted from their expertise at reduced compensation and postponed the ownership decision. ECF 89 at 33. There is a genuine dispute of fact over whether Defendants' reliance on that expectation of future ownership was justifiable. The factfinder could find credible their understanding that they came to Plaintiff to contribute to its development as a means to become business owners. Lastly, McClure and Biederman present evidence of actual damages in the form of reduced income. McClure took a $42,600 pay cut, and Biederman took a $5,000 pay cut. McClure also claims unpaid "sweat equity" for the additional services he provided. ECF 89 at 34.

It will be for the factfinder to decide whether McClure and Biederman actually prove the elements of the causes of action. However, there are sufficient disputes of material fact to deny summary judgment.

## VI.    Unjust Enrichment (Counterclaim)

McClure claims unjust enrichment for the technological and marketing work that he did for Plaintiff. To prevail, McClure must demonstrate that it would be unjust for Plaintiff to retain the benefit of that additional service without compensating him for it. *See Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000). The test for "whether injustice results often will turn on whether a party engaged in some type of wrongdoing." *Id.* Wrongdoing consists of improper, deceitful, or misleading conduct by the benefitting party. *See DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 122 (Colo. 1998). However, a showing of wrongdoing is not required if the claim arises from a special relationship. *See Lewis v. Lewis*, 189 P.3d 1134, 1142 (Colo. 2008).

McClure attests that he provided those additional services on the expectation that he later would receive an ownership share. ECF 83-12 at ¶¶ 36, 39, 41. Because Plaintiff never followed through on that promise, he seeks compensation for that work time. McClure seeks similar redress with his misrepresentation counterclaims, but Plaintiff does not address whether the availability of those two remedies precludes McClure from proceeding on the unjust enrichment counterclaim. Instead, Plaintiff disagrees that the work went unpaid. Clark attests that McClure was permitted to perform additional tasks "as part of his job responsibilities," and that he "was compensated for each hour worked at MSC at the agreed upon hourly rate." Clark also refers to the wage claim that McClure filed with the CDLE. ECF 93-1 at ¶¶ 9–10, 21. Given the direct contradiction in their testimonies, it will be for the factfinder to determine whether McClure was compensated for the additional services that he provided, and if not, whether Plaintiff unjustly enriched itself by not following through on a promise of equity.

**VII.    Defamation (Counterclaim)**

In their Response (ECF 89 at 20), Defendants list the eight statements that they argue were defamatory. The first two were purportedly witnessed by the late Mike Waters. Mr. Waters evidently recalled a SESAC Board of Directors meeting in November 2018 when Clark made various derogatory comments to him about the Defendants, including that they had taken "stuff and computers and other things without permission." ECF 83-57 at ¶¶ 32–33. Mr. Waters also reportedly said that Clark "told the SESAC board as a whole that [Defendants] had left without giving him notice." ECF 83-57 at ¶ 35. McClure attests that on January 28, 2020, Kathy Freeman of HEI Civil forwarded him an email that she received from Clark in which Clark describes Plaintiff as the only company in Colorado who can offer business to business training and that has other certifications. McClure says that it prompted Ms. Freeman to inquire "if she was covered, implying that she thought [Defendants'] training was not appropriately accredited or legal." ECF 89-18 at ¶¶ 1–7.

Defendants argue that the above statements are defamatory *per se*. However, they proffer insufficient evidence that Clark actually made them. Mr. Waters' declaration is unsigned. Defendants explain that Mr. Waters unexpectedly passed away before he could sign it, but that there were other witnesses present who "may be able to validate these claims of Mr. Waters at trial." ECF 89 at 8, n.3. McClure does not attach to his affidavit the email from Ms. Freeman; he only discusses it as hearsay.

Plaintiff admits that Clark told the Frederick Police Department that Defendants had stolen items from it and that McClure had harmed its website. However, Plaintiff asserts qualified privilege because they were made in reports to law enforcement about possible criminal conduct. *See Lawson v. Stow*, 327 P.3d 340, 346 (Colo. App. 2014). To overcome qualified privilege,

Defendants must prove (1) the falsity of the statement by clear and convincing evidence, (2) Clark made the statement with actual malice, and (3) actual damages, even if the statement is defamatory *per se*. *See id*. Regardless of whether Defendants can establish the first two elements, they submit no evidence of actual, quantifiable damages. Defendants only express concern about future clients finding the police reports.

Plaintiff admits that after the police had closed the matter, it told the CDLE that Defendants were subject of an ongoing police investigation, and that it told the Denver District Court that Defendants had stolen the entirety of its business operations. However, to the extent any such statement can be attributed to Clark or Plaintiff (and not their counsel), those statements were made in the course of litigation. "Generally, statements made in the course of judicial or quasi-judicial proceedings, even if the remarks are false or defamatory and made with knowledge of their falsity, are absolutely privileged if they bear some relation or reference to the subject of the inquiry." *Dep't of Admin. v. State Pers. Bd. of Colo.*, 703 P.2d 595, 597–98 (Colo. App. 1985).

Plaintiff admits Clark told Aspire that Defendants "had stolen these items and deleted more from the system." The statements are in the text messages that Clark and Aspire exchanged between November 1, 2018 and January 22, 2019. ECF 83-35. Defendants identify no resulting damages. In the absence of damages, Defendants must prove that the statements were defamatory *per se*. *See Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004). Whether a statement is defamatory is a question of law. *See id*. To be defamatory *per se*, the statement must be "on its face and without extrinsic proof, unmistakably recognized as injurious (defamatory meaning)." *Id*. Defendants argue that the statements accuse them of a criminal offense. *See id*. (identifying the imputation of a criminal offense as one of the traditional *per se* categories). However, statements made to its IT provider as part of Plaintiff's investigation into what Defendants may have done with its data is

not unmistakably defamatory and injurious on its face. For one, it is ambiguous whether the statements impute criminal activity or merely provide context for the requested IT assistance. If Plaintiff did mean to impute criminal activity, Plaintiff expressed it in the context of investigating potential wrongdoings that are subject of this lawsuit and for which Aspire is a witness. That would bring the statements under the absolute litigation privilege.

None of the alleged defamatory statements are actionable. Defendants either present insufficient evidence to support them, or they fail as a matter of law. Consequently, summary judgment is granted on the defamation counterclaim.

## VIII.   Supplemental Jurisdiction

Should they prevail on their summary judgment motion on the federal claims, Defendants ask that the Court dismiss any remaining state law claims for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). ECF 83 at 39, 118. Plaintiff does not address this request in its Response.

A federal court may decline to exercise supplemental jurisdiction over remaining state law claims if the principles of comity and federalism favor litigating them in state court. *See Marquez v. Harvest Standard, LLC*, No. 09-cv-02584-PAB-MJW, 2011 WL 1755265, at *1 (D. Colo. 2011). However, countervailing reasons of judicial economy, convenience, and fairness to the litigants may compel a federal court to exercise supplement jurisdiction to keep state law claims. *See Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997). Having weighed the competing factors, the Court finds that it should exercise supplemental jurisdiction over the remaining state law claims. The parties already have expended a great deal of time and energy litigating in federal court. Discovery is over, and the pending summary judgment motions cover all of the parties' claims and counterclaims. Therefore, the Court denies Defendants' request.

## **CONCLUSION**

The S-Drive data indeed may be valuable to Plaintiff and may have benefitted Defendants, but it does not necessarily follow that Plaintiff suffered a CFAA or trade secret misappropriation violation as the law specifically defines those offenses. Nor do Defendants present an actionable defamation counterclaim. However, the parties do provide evidence from which a reasonable factfinder might find for Plaintiff on its employment and theft-related causes of action or for Defendants on their misrepresentation and unjust enrichment counterclaims. Many of the state law claims turn on party credibility.

Accordingly, the Court **grants** Defendants' Motion for Summary Judgment [filed July 13, 2020; ECF 83] **in part**, with respect to the CFAA and DTSA claims and the related C.R.S. § 18-5.5-102(1)(a)-(c) and CUTSA claims. The Court also **grants** the Motion with respect to the theft-based causes of action against McClure regarding the physical equipment and against McClure and Biederman regarding the external hard drives. However, the Court **denies** the Motion with respect to the duty of loyalty and tortious interference claims, the remaining theft-based claims, including the C.R.S. § 18-5.5-102(1)(d) data theft claim, and the trespass claim.

The Court **grants** Plaintiff's Motion for Summary Judgment [filed July 13, 2020; ECF 82] **in part**, with respect to Defendants' defamation counterclaim. However, the Court **denies** the Motion with respect to the misrepresentation and unjust enrichment counterclaims.

Entered this 18th day of December, 2020, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge